1  Victor L. George, State Bar No. 110504
   Wayne C. Smith, State Bar No. 122535
2  Elvis Tran, State Bar No. 281620
   LAW OFFICES OF VICTOR L. GEORGE
3  20355 Hawthorne Blvd., First Floor
   Torrance, California  90503
4  Telephone:  (310) 698-0990
   Facsimile:   (310) 698-0995
5  E-Mail:      vgeorge@vgeorgelaw.com

6  Attorneys for Plaintiff,
   DONN CARPER

7

8              **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11  DONN CARPER,                          CASE No. 2:15-cv-04259-VAP (SSx)
                                          [Assigned to the Virginia A. Phillips]
12              Plaintiff,

13       v.                              **PLAINTIFF'S OPPOSITION TO
                                         DEFENDANTS' MOTION FOR
14  TRIBUNE MEDIA, a business,           SUMMARY JUDGMENT;
    form unknown; KTLA, LLC, a           MEMORANDUM OF POINTS AND
15  business, form unknown, and          AUTHORITIES IN SUPPORT
    DOES 1 through 100, inclusive,       THEREOF**
16
                Defendants.              [Filed concurrently with:
17                                       1. Plaintiff's Response to Defendants' Statement
                                            of Undisputed Facts and Conclusions of Law;
18                                       2. Declaration of Mike Kincaid;
                                         3. Declaration of Elvis Tran, Esq.]
19

20                                       Date:    May 23, 2016
                                         Time:    2:00 p.m.
21                                       Crtrm:   780

22                                       Complaint filed:    April 23, 2015
                                         Trial Date:         August 9, 2016
23

24

25       Plaintiff DONN CARPER submits his Opposition to Defendants' Motion for

26  Summary Judgment as follows:

27

28

# **TABLE OF CONTENTS**

**I.**    **INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II.**   **STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    MR. CARPER IS HIRED BY KTLA DUE TO HIS HISTORY OF EXCELLENT PERFORMANCE SELLING ADVERTISEMENTS IN THE TELEVISION INDUSTRY. . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    MR. CARPER WORKED AS AN ACCOUNT EXECUTIVE IN THE SALES DEPARTMENT AT KTLA. . . . . . . . . . . . . . . . . . . . . . 6

      C.    MR. CARPER PERFORMED AT A HIGH LEVEL DURING HIS EMPLOYMENT AT KTLA AND ANY ALLEGED PERFORMANCE ISSUES ARE KTLA'S REVISIONIST HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      D.    MR. CARPER IS NOTIFIED OF HIS DECEMBER 2014 LAYOFF IN AUGUST 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      E.    KTLA'S LACK OF DOCUMENTATION DEMONSTRATING BUDGETARY ISSUES IN 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      F.    KTLA HIRES TWO NEW SUBSTANTIALLY YOUNGER ACCOUNT EXECUTIVES WHOM BEGAN WORKING IN THE SALES DEPARTMENT AT KTLA IN FEBRUARY 2014. . . . . . . . . 9

      G.    MR. CARPER IS THE SINGLE NON-UNION EMPLOYEE LAID OFF DUE TO BUDGETARY REASONS IN 2014. . . . . . . . . . . . . . 10

      H.    KTLA RECOMMENDS MR. CARPER TO ITS SISTER STATION IN SAN DIEGO, KSWB, DESPITE MR. CARPER'S ALLEGED PERFORMANCE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      I.    KTLA'S LACK OF POLICIES AND PROCEDURES. . . . . . . . . . . 11

      J.    KTLA'S CLAIM OF AFTER-ACQUIRED "MALFEASANCE" ARE ADDITIONAL TRIABLE ISSUES OF MATERIAL FACT. . . 12

**III.** **SUMMARY JUDGMENT SHOULD NOT BE GRANTED CONSIDERING ALL FACTS AND VIEWING ALL INFERENCES IN FAVOR OF MR. CARPER**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**IV.** **MCDONNELL DOUGLAS BURDEN SHIFTING STANDARD**. . . . . 14

**V.**   **PLAINTIFF HAS MADE A PRIMA FACIE SHOWING OF AGE DISCRIMINATION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**VI.** **PLAINTIFF HAS SUFFICIENT CIRCUMSTANTIAL EVIDENCE TO DEMONSTRATE A CAUSAL CONNECTION BETWEEN HIS AGE AND DEFENDANT'S TERMINATION**. . . . . . . . . . . . . . . . . . . 17

      A.    MR. CARPER WAS REPLACED BY SUBSTANTIALLY YOUNGER EMPLOYEES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

B.   MR. CORSINI'S REMARKS REGARDING MR. CARPER'S
     RETIREMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C.   KTLA'S LACK OF DOCUMENTATION. . . . . . . . . . . . . . . . . . . 19

D.   KTLA'S ONE PERSON REDUCTION IN FORCE. . . . . . . . . . . . . 20

E.   KTLA'S FAILURE TO FOLLOW ITS OWN POLICIES AND
     PROCEDURES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VII.   **PLAINTIFF'S PUBLIC POLICY CLAIM SURVIVES**. . . . . . . . . . . . 22

VIII.  **PLAINTIFF'S CLAIM OF PUNITIVE DAMAGES SURVIVES**. . . . . . 22

IV.    **PLAINTIFF DOES NOT DISPUTE THAT TRIBUNE MEDIA
       WAS NOT PLAINTIFF'S EMPLOYER**. . . . . . . . . . . . . . . . . . . . . . . . 23

X.     **AFTER ACQUIRED EVIDENCE SHOULD NOT BE GRANTED**. . . . 23

XI.    **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Donn Carper ("Mr. Carper"), sixty nine (69) years old at the time of his layoff, the oldest account executive by far in the Sales Department[1], was notified of his job elimination in August 2014 to be effective in December 2014.  Defendant KTLA's ("KTLA") former Human Resource Director, Barbara Lopez-Nash, testified that Mr. Carper was the single non-union employee chosen for a layoff, a one person Reduction-In-Force ("RIF") due to budgetary reasons at KTLA.  At the time of Mr. Carper's layoff, KTLA employed 556 full time and part times employees.

KTLA's legitimate business reason for terminating Mr. Carper is two pronged: 1) A RIF was necessary due to budgetary concerns which required only one account executive to be laid off; 2) Mr. Carper was chosen for the RIF due to his performance.

*First*, numerous triable issues of material fact exist with regard to KTLA's purported budgetary concerns in 2014. KTLA's President Don Corsini ("Mr. Corsini") testified that by January 2014 KTLA was pacing off more than $2 million.  Yet, despite Mr. Corsini's claim that KTLA was behind in sales $2 million by January 2014, two new substantially younger account executives, Mark Harper (38 years old) and Claudia Schell (41 years old), began working at KTLA in February 1, 2014.  Mr. Carper maintained a $126,000 base salary, whereas Mr. Harper and Ms. Schell were each given a higher base salary of $140,000 per year.

Ms. Lopez-Nash testified that no other non-union employees were RIF'd during KTLA's "down year" in 2014.[2]  Mr. Corsini testified that he has never witnessed an

---

[1] KTLA's Sales Department consist of account executives who report to local sales managers ("LSMs"), LSMs who report to the General Manager, and the General Manager who reports to the Vice President of Sales.  The Vice President of Sales is the head of the Sales Department and reports directly to KTLA's President.

[2] Ms. Lopez-Nash testified that union employees were treated differently because "there was information written in collective bargaining agreements about

1

account executive from the Sales Department ever being RIF'd due to budgetary reasons. KTLA's Local Sales Manager, Troy-Arce Ganier, testified that throughout her employment at KTLA, Mr. Carper was the first job elimination she has ever witnessed at KTLA due to budgetary concerns.

Most importantly, Mr. Corsini, Ms. Lopez-Nash, KTLA's former CFO Mike Weiner, KTLA's Vice President of Sales[3], Mary Pouliopoulos, and each of KTLA's currently employed LSMs each testified that all discussions about budgetary concerns at KTLA were done *verbally* at weekly manager meetings. Each further testified that they do not possess or have any seen any e-mail, memorandum, or meeting minutes which would reflect budgetary concerns in 2014. Mr. Weiner, designated as KTLA's Person Most Knowledgeable on KTLA's 2014 budgetary concerns, testified that additional cost cutting measures included such as reducing overtime hours, reducing food and beverage expenses, and reducing repair expenses in all departments at KTLA. Nevertheless, Mr. Weiner similarly testified that all conversations about cost cutting measures were done only verbally at weekly "managers meetings" and has never seen a single e-mail, memorandum, or meeting minutes about these cost cutting measures.

*Second*, numerous triable issues of material fact exist with regard to KTLA's selection of Mr. Carper to be laid off due to performance. KTLA's current Vice President of Sales, Mary Pouliopoulos, testified that the decision to choose Mr. Carper was made by herself and Mr. Corsini was based on Mr. Carper's performance. To support this claim, KTLA introduces evidence to demonstrate the following: 1) Mr. Carper was hired as a "favor" by KTLA's former Vice President Mr. Kincaid due to

how a reduction in force would take place."

[3] Between 2009 to February 2013, Mike Kincaid was the Vice President of the Sales Department and Ms. Pouliopoulos was the General Manager of the Sales Department. During this time period, Ms. Pouliopoulos reported to Mr. Kincaid. Mr. Kincaid retired in February 2013 and Ms. Pouliopoulos was subsequently promoted to Vice President of the Sales Department.

their former friendship; 2) Mr. Corsini and KTLA's LSM Patti Tang did not want to hire Mr. Carper because of his alleged performance issues; and 3) Mr. Carper had performance issues his entire duration of being employed at KTLA.

This evidence is sharply disputed by Mr. Kincaid himself, who declared: 1) Mr. Kincaid pursued the decision to hire Mr. Carper because Mr. Carper was an excellent performer as an account executive; 2) Mr. Corsini never provided any disagreement to Mr. Kincaid over the decision to hire Mr. Carper other than raising a minor personal issue which was resolved; 3) Mr. Kincaid declared that he informed Ms. Tang that Mr. Carper would be hired and Ms. Tang never provided any disagreement; 4) Mr. Carper strived for the best client satisfaction, positive relationships with clients and internally with his sales team, timely in all respects, always prepared, and did whatever was necessary to excel as an account executive; and 5) Between 2009 to the time he retired in February 2013, he only heard one isolated complaint regarding a long e-mail, which he reviewed as the head of the Sales Department and believed to be "blown out of proportion." Further, Ms. Pouliopoulos testified that no other account executive *was ever even considered* for KTLA's one person RIF due to budgetary concerns.

KTLA's post-litigation theory that Mr. Carper was chosen for layoff due to performance is further weakened by assurances by Ms. Pouliopoulos that Mr. Carper was not being terminated for performance. Mr. Carper was notified by KTLA of his December 2014 layoff in August 2014 by Ms. Pouliopoulos and Ms. Lopez-Nash. Ms. Lopez-Nash began the meeting by stating: "We assumed you wanted to retire, and if you do, Don Corsini wants to throw your retirement party." Mr. Carper was shocked by this comment and explained he had no intention of retiring. Nevertheless, the meeting continued and Mr. Carper inquired "Am I being fired for performance?" Ms. Pouliopoulos then confirmed to Mr. Carper that he was not being fired for performance, but that his job was being eliminated. In at least one e-mail, Mr. Corsini discusses Mr. Carper's layoff and mentions that Mr. Corsini is willing to throw Mr. Carper a "no-host retirement" party.

3

Moreover, following Mr. Carper being notified of his termination in August 2014, Mr. Carper requested an alternative to transfer to KTLA's sister station, KSWB, to be an account executive. Mr. Corsini permitted Mr. Carper to transfer to KSWB. Mr. Corsini, Ms. Pouliopoulos, Ms. Ganier, Ms. Tang, Mr. Duarte, nor Ms. Lopez-Nash ever once voiced disagreement or concern with Mr. Carper's potential transfer despite his the plethora of his alleged deficiencies. In fact, Ms. Lopez-Nash believed Mr. Carper transferring to KSWB was a "great idea." Post-litigation, Mr. Corsini appears to now claim that his recommendation to Mr. Carper to KSWB was due to the different market structures, testifying: "The dynamics in San Diego are such where it's more one-on-one, shake hands, be close to your clients." Nevertheless, when questioned at deposition how a different market could change KTLA's claimed performance issues such as getting along with management, Mr. Carper having lengthy e-mails, or Mr. Carper going around his direct managers to higher management, Mr. Corsini had no explanation but simply concludes: "I don't believe that would have happened in San Diego."

Finally, KTLA claims much of Mr. Carper's performance issues are documented. In September 2012, Mr. Carper receives a 1.5 page written warning from Ms. Poulipolous in conjunction with Ms. Lopez-Nash, which outlined some specific instances of Mr. Carper's deficiencies. In October 2012, Mr. Carper responded to said written warning with a two page letter indicating questions and misunderstandings. Despite doing so, *no one* at KTLA ever discussed with Mr. Carper his written response.

Suspiciously, in November 2013, Mr. Carper allegedly receives a "Last and Final Written Warning" from Mr. Duarte. Mr. Carper's signature is nowhere to be found on this last and final written warning. Mr. Carper testified the first time he ever saw this document was post-litigation. Further, Ms. Lopez-Nash testified she did not give this document to Mr. Carper, and believed Mr. Duarte would have. Ms. Lopez-Nash testified that throughout her entire employment at KTLA, she could not think of

4

a single other employee who was issued a "Last and Final Written Warning" without being given to an employee for their signature.  Mr. Kincaid declares he is familiar with KTLA's policies and procedures and it would be against KTLA's policies and procedures "to issue an employee a document as crucial as a final warning without ever giving it to an employee."

    With all inferences to be made in favor of Mr. Carper, this Court should deny Defendant's Motion for Summary Judgment.

## II.   STATEMENT OF FACTS

### A.   MR. CARPER IS HIRED BY KTLA DUE TO HIS HISTORY OF EXCELLENT PERFORMANCE SELLING ADVERTISEMENTS IN THE TELEVISION INDUSTRY

    Mr. Carper began his career selling TV advertisements as an account executive since 1968. (SS 1).  Mr. Carper had over 40 years of experience in selling TV advertisements before being hired at KTLA in 2009. (SS 2).  Mr. Carper's experience in the industry prior to joining KTLA also included executive and management positions at ABC, UNIVISION,  DDLA Inc., UVC, and KSLA Media. (SS 3). Mr. Carper met Mr. Corsini and Mr. Kincaid while the three worked together at ABC between 1974 and 1986. (SS 4). Mr. Carper also worked with Mr. Corsini and Mr. Kincaid at KCBS. (SS 5).

    In September 2008, Mr. Carper's position of Vice-President of New Business Development and Marketing was eliminated from KCBS. (SS 6). In 2009, Mr. Corsini and Mr. Kincaid left KCBS and joined KTLA. (SS 7).  At the time that Mr. Carper was hired at KTLA, Mr. Corsini was the President and Mr. Kincaid was the Senior Vice President of Sales. (SS 8).

    Mr. Kincaid declares under oath[4] that he pursued hiring Mr. Carper because of his prior decades of excellent performance:

---

[4]  Mr. Kincaid's declaration was provided to Defendant over a month ago in March 2016 and Mr. Kincaid has yet to be subpoenaed for deposition.

I pursued the decision to hire Mr. Carper after I joined KTLA in 2009 because I believed he was an excellent performer as an account executive.

(SS 9).

Mr. Kincaid also declares that he was principally responsible for hiring Mr. Carper, but that he needed Mr. Corsini's approval. (SS 10). Mr. Corsini never provided any disagreement to Mr. Kincaid over the decision to hire Mr. Carper other than raising a minor personal issue which was resolved. (SS 11). Mr. Kincaid also declared that he also informed Ms. Tang that Mr. Carper would be hired and Ms. Tang never provided any disagreement. (SS 12).

## B.   MR. CARPER WORKED AS AN ACCOUNT EXECUTIVE IN THE SALES DEPARTMENT AT KTLA

As an account executive in the Sales Department, Mr. Carper reported directly to Local Sales Managers ("LSM"). (SS 13).  LSM's during Mr. Carper's employment included Troy Arce Ganier, Patti Tang, Nancy Caldwell, and Jozef Duarte. (SS 14). From the start of Mr. Carper's employment in 2009 to February 2013, LSM's reported to the General Manager of the Sales Department, Mary Poulipolous, who in turn reported to Mike Kincaid, Senior Vice President of Sales. (SS 15).  Mr. Kincaid reported directly to Mr. Corsini. (SS 16).

Mr. Kincaid retired from KTLA in February 2013. (SS 17).  Following Mr. Kincaid's retirement, Ms. Poulipolous became General Manager/Vice President of the Sales Department, and Ms. Poulipolous reported directly to Mr. Corsini. (SS 18).

## C.   MR. CARPER PERFORMED AT A HIGH LEVEL DURING HIS EMPLOYMENT AT KTLA AND ANY ALLEGED PERFORMANCE ISSUES ARE KTLA'S REVISIONIST HISTORY

Mr. Corsini, Ms. Poulipolous, Ms. Tang, Ms. Ganier, and Mr. Duarte each still remain employed by KTLA. (SS 19).  Mr. Kincaid, a former high ranking manager at KTLA, declared that Mr. Carper was an excellent account executive:

Mr. Carper strived for the best client satisfaction, positive relationships with clients and internally with his sales team, timely in all respects, always prepared,

6

1    and did whatever was necessary to excel as an account executive.

2    (SS 20).

3    Mr. Kincaid further declared that during his employment as Vice President of

4    the Sales Department, he only recalls hearing one isolated incident regarding Mr.

5    Carper's long e-mails which he reviewed and believed to be "blown out of proportion."

6    (SS 21).   During Mr. Carper's employment at KTLA, Mr. Carper was an account

7    executive for David Ross, owner of Ross Advertising Inc., Candace Ross, senior

8    negotiator of Callan Advertising, and Kristen Werner, former Senior Media Buyer at

9    Far West Media. (SS 22).

10   Mr. Ross testified as follows: 1) Mr. Carper was "[o]ne of the best [account

11   executives] I've ever had" (SS 23); 2) Mr. Carper was "one of a small handful of the

12   best that's ever called on me" (SS 24); 3) "With Mr. Carper, no detail ever fell through

13   the cracks . . . . [which] is expected of station account executives" (SS 25); and 4) Mr.

14   Ross never made a negative phone call to Ms. Tang about Mr. Carper's performance

15   (SS 26).  Mr. Ross further testified:

16   [T]he KTLA Television or any other television station or radio station in

17   America that I deal with where it is highly negotiable, it is a high stress

18   business, where I could get on the telephone and be yelling, as an example, at

19   Mr. Carper about "your television station," and I do it for effect.  Never anything

20   personal, never his being negligent of duty."

21   (SS 27).

22   Ms. Ross testified as follows: 1) Ms. Ross was "very satisfied" with Mr.

23   Carper's performance on her account (SS 28); 2) Mr. Carper would always make

24   himself readily available to Ms. Ross (SS 29); and 3) Ms. Ross did not recall ever

25   having any complaints about Mr. Carper not responding to her needs in a timely

26   fashion despite admitting that Ms. Ross herself is "a very impatient person." (SS 30).

27   Ms. Werner testified as follows: 1) Ms. Werner believed Mr. Carper "was a very

28   good rep" and was "shocked to hear he had been let go" (SS 31); 2) Mr. Carper knew

7

what Far West Media was "looking for" (SS 32); 3) Mr. Carper was always courteous to Ms. Werner (SS 33); 4) Ms. Werner never complained about Mr. Carper (SS 34); 5) Ms. Werner received long e-mails from Mr. Carper which she deemed a "good e-mail" (SS 35); and 6) Mr. Carper would always respond to Ms. Werner in a timely fashion.  (SS 36).

### D.   MR. CARPER IS NOTIFIED OF HIS DECEMBER 2014 LAYOFF IN AUGUST 2014

In August 2014, Mr. Carper was unexpectedly called into a meeting with Ms. Poulipolous and Barbara Lopez-Nash. (SS 37). Ms. Nash is KTLA's former Regional Human Resources Director. (SS 38).  Mr. Carper testified that at this meeting, Ms. Poulipolous informed Mr. Carper that KTLA would be eliminating Mr. Carper's sales position. (SS 39). Mr. Carper was told his job position would be eliminated effective December 2014. (SS 40). Ms. Poulipolous' comment was followed by Ms. Lopez-Nash, who stated: "We assumed you wanted to retire, and if you do, Don Corsini wants to throw your retirement party." (SS 41).  In at least one e-mail, Mr. Corsini, mentions that he is willing to throw Mr. Carper a "no-host retirement" party. (SS 42).

Mr. Carper responded "What gave you the idea that I wanted to retire?  It's not on my radar." (SS 43).  Mr. Carper was shocked and surprised, further inquiring whether he was being fired for performance. (SS 44).  Ms. Poulipolous assured Mr. Carper that he was not being fired for performance but that his job was being eliminated. (SS 45).

Mr. Corsini and Ms. Poulipolious testified that they collaboratively made decision to choose Mr. Carper to be laid off. (SS 46).  Ms. Poulipolious testified that as part of the discussion for selecting an account executive to be laid off, no other account executive was ever even considered for Defendant's RIF due to budgetary reasons.  (SS 47).

At the time of Mr. Carper's layoff in December 2014, Mr. Carper was 69 years old, the oldest account executive in the Sales Department at KTLA. (SS 48).

8

1

2

### E.   KTLA'S LACK OF DOCUMENTATION DEMONSTRATING BUDGETARY ISSUES IN 2014

3    In 2014, KTLA employed 556 full time and part times employees. (SS 49).

4    Throughout Mr. Corsini's entire duration of being employed at KTLA, Mr. Corsini

5    does not recall ever eliminating an account executive from the Sales Department due

6    to budgetary reasons.  (SS 50).

7         Mr. Corsini, Ms. Poulipolous, Ms. Tang, Ms. Ganier, and Mr. Duarte each

8    testified that KTLA had budgetary issues in 2014 and budgetary issues were all done

9    verbally in weekly "managers meetings." (SS 51). Mike Weiner, KTLA's former Chief

10   Financial Officer, testified that cost cutting measures were instituted due to budgetary

11   reasons in 2014 which included reducing overtime hours, reducing food and beverage

12   expenses, and reducing repair expenses. (SS 52).  Mr. Weiner likewise testified that

13   all conversations about cost cutting measures were all done verbally at weekly

14   "managers meetings."  (SS 53).

15        Mr. Corsini, Ms. Poulipolous, Ms. Tang, Ms. Ganier, Mr. Duarte, and Mr.

16   Weiner each testified that they do not possess nor have ever seen a single e-mail,

17   memorandum, or meeting minutes relating to budgetary issues at KTLA in 2014. (SS

18   54).  All communications by these individuals relating to budgetary issues at KTLA

19   in 2014 were all done verbally without any type of written e-mails, memorandums, or

20   meeting minutes from the weekly "managers meetings." (SS 55).

21

22

### F.   KTLA HIRES TWO NEW SUBSTANTIALLY YOUNGER ACCOUNT EXECUTIVES WHOM BEGAN WORKING IN THE SALES DEPARTMENT AT KTLA IN FEBRUARY 2014

23        Despite Mr. Corsini's claim that KTLA was behind in sales $2.2 million by

24   January 2014, Mark Harper and Claudia Schell began working at KTLA as account

25   executives in the Sales Department in February 1, 2014. (SS 56).  Mr. Carper

26   maintained a $126,000 base salary while employed at KTLA, whereas Mr. Harper and

27   Ms. Schell were each given a higher base salary of $140,000 per year with the

28   potential for additional compensation based on commission. (SS 57).

At the time Mr. Harper and Ms. Schell began working at KTLA in February 2014, Ms. Schell was 38 years old and Mr. Harper was 41 years old. (SS 58).  After Mr. Harper and Ms. Schell were hired, several of Mr. Carper's accounts were taken from his account list and given to Mr. Harper and Ms. Schell. (SS 59).  Moreover, upon being laid off in December 2014, additional accounts that belonged to Mr. Carper were given to Mr. Harper (38 years old) and Ms. Schell (41 years old). (SS 60).  Specifically, Mr. Carper was required to transfer his Living Spaces account, worth over $1 million dollars annually in sales. (SS 61).

Ms. Poulipolous testified that no other employee in the Sales Department (including Mr. Harper and Ms. Schell) were ever considered as part of the layoff. (SS 62).

### G.   MR. CARPER IS THE SINGLE NON-UNION EMPLOYEE LAID OFF DUE TO BUDGETARY REASONS IN 2014

Ms. Lopez-Nash testified that Mr. Carper was the single non-union employee chosen for a layoff, a one person Reduction-In-Force ("RIF") due to budgetary reasons at KTLA. (SS 63).  Ms. Lopez-Nash further testified that no other non-union employees were RIF'd during KTLA's striking down year in 2014. (SS 64).  Ms. Ganier testified that during her ten (10) years of being employed at KTLA, she was not aware of a *single* other employee being subject to a RIF due to budgetary concerns. (SS 65). Mr. Corsini testified that throughout his duration of being President, he could not recall ever laying of a single account executive from the Sales Department due to budgetary concerns. (SS 66).

### H.   KTLA RECOMMENDS MR. CARPER TO ITS SISTER STATION IN SAN DIEGO, KSWB, DESPITE MR. CARPER'S ALLEGED PERFORMANCE ISSUES

After being notified of his layoff in August 2014, Mr. Carper met with Mr. Corsini and John Moczulski, KTLA's Station Manager. (SS 67). Mr. Carper complained that KTLA was "dump[ing] the old guy." (SS 68). Mr. Carper requested instead of being eliminated, if he could instead transfer to KTLA's sister station,

KSWB, in San Diego. (SS 69). Mr. Corsini "blessed" the idea and Ms. Lopez-Nash set up a meeting between Mr. Carper and KSWB's Station Manager, Scott Heath and KSWB's General Manager, Kelly McMackin. (SS 70).

Although KTLA claims Mr. Carper had performance issues from the time he was hired at KTLA, Mr. Corsini, Ms. Poulipolous, Ms. Ganier, Ms. Tang, Mr. Duarte, nor Ms. Lopez-Nash ever once voiced disagreement or concern with Mr. Carper transferring to KSWB. (SS 71). In fact, Ms. Lopez-Nash believed Mr. Carper transferring to KSWB was a "great idea" despite alleged performance deficiencies. (SS 72).

Post-litigation, Mr. Corsini appears to now claim that his recommendation to Mr. Carper to KSWB was due to the different market structures, testifying: "The dynamics in San Diego are such where it's more one-on-one, shake hands, be close to your clients." (SS 73). Nevertheless, when questioned at deposition how a different market could change KTLA's claimed performance issues such as getting along with management, Mr. Carper having lengthy e-mails, or Mr. Carper going around his direct managers to higher management, Mr. Corsini had no explanation but simply concludes: "I don't believe that would have happened in San Diego." (SS 74).

Mr. Carper did well in his meetings with Mr. McMackin and Mr. McMackin and was given an offer as an account executive at KSWB earning a $45,000 salary plus commission, compared to Mr. Carper's $126,000 salary plus commission while employed at KTLA. (SS 75). Mr. Carper believed compensation offered by KSWB was entry level and not sufficient for his skills and experience, thus declining the offer. (SS 76).

## I.   KTLA'S LACK OF POLICIES AND PROCEDURES

In September 2012, Mr. Carper received a written warning from Ms. Pouliopoulos which Mr. Carper signed and acknowledged receipt. (SS 77). Mr. Carper disagreed with the written warning and in October 2012, Mr. Carper responded to the written warning in writing. (SS 78). No employee at KTLA ever discussed Mr.

Carper's response to this written warning. (SS 79).  KTLA simply put Mr. Carper's response in his employee file and never revisited this issue. (SS 80).

In November 2013, Mr. Duarte, Ms. Pouliopoulos, and Ms. Lopez-Nash collaboratively created a "Last and Final Written Warning." (SS 81).  Mr. Carper's signature is nowhere to be found on this document. (SS 82).  Shockingly, this "Last and Final Written Warning" was not seen by Mr. Carper until he requested his personnel file following his layoff from KTLA. (SS 83).  Mr. Duarte testifies that he never gave the Last and Final Written Warning to Mr. Carper. (SS 84).  Ms. Lopez-Nash testified she never gave the Last and Final Written Warning to Mr. Carper. (SS 85).  Ms. Poulipolous does not recall ever seeing Mr. Carper's Last and Final Written Warning.  (SS 86)

Ms. Lopez-Nash testified that during her 17 years of employment at KTLA, she could not recall a single other instance where a Last and Final Written Warning was placed in a non-union employee's file that the employee did not receive. (SS 87).  Mr. Kincaid declares:

> I understand that Mr. Carper was issued a last and final written warning, but it was never presented to him or given to him for his signature.  As the Vice President of Sales, I was familiar with KTLA's policies and procedures as they relate to the disciplining of employees, particularly so in the Sales Department. I believe it would be against KTLA's policies and procedures to issue a document as crucial as a final warning without ever giving it to an employee for his or her signature.

(SS 88).

### J.     KTLA'S CLAIM OF AFTER-ACQUIRED "MALFEASANCE" ARE ADDITIONAL TRIABLE ISSUES OF MATERIAL FACT

In October 2014, Mr. Carper exchanged e-mails with individuals handling KTLA's Kevin Jeweler's account, in which Mr. Carper agreed to change Kevin Jeweler's advertisements scheduled to run in November and December to a cheaper

12

time slot. (SS 89)  Ms. Tang was the LSM on the Kevin Jewelers account. (SS 90).

Kevin Jewelers confirmed in March 2015 that the changes Mr. Carper agreed to for the

November advertisements were properly changed. (SS 91).  Mr. Carper testified he did

not remember if he made these changes for December 2014 advertisements run, but

further testified "But I confirmed it.  So I would think that would have been done." (SS

92).  Ms. Tang testified that Mr. Carper gave an update on each of his accounts before

he left KTLA in 2014, but that she could not recall if Mr. Carper ever gave Ms. Tang

an update on the Kevin Jewelers account.  (SS 93).

Prior to budgetary concerns in 2014, despite Mr. Carper's performance issues,

including alleged argumentative e-mails, long e-mails, and poor client service, Ms.

Pouliopoulos, Ms. Tang, Mr. Duarte, and Ms. Ganier have never once recommended

Mr. Carper for termination due to performance deficiencies. (SS 94).

## III.   SUMMARY JUDGMENT SHOULD NOT BE GRANTED CONSIDERING ALL FACTS AND VIEWING ALL INFERENCES IN FAVOR OF MR. CARPER

"The evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in his favor.  Neither do we suggest that the trial courts should act

other than with caution in granting summary judgment or that the trial court may deny

summary judgment in a case where there is reason to believe that the better course

would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255, 106 S. Ct. 2505, 2513, 91 L.Ed. 2d 202 (1986).

Mr. Carper is only required to show "that sufficient evidence supporting the

claimed factual dispute be shown to require a jury or judge to resolve the parties'

differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391

U.S. 253, 288, 88 S. Ct. 1575, 1592, 20 L.Ed. 2d 569 (1968).

"The court's ultimate inquiry is to determine whether the 'specific facts' set

forth by the nonmoving party, coupled with undisputed background or contextual

facts, are such that a rational or reasonably jury might return a verdict in its favor

based on that evidence." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.

1  2d 626, 631 (9th Cir. 1987).

2    Mr. Carper "need only present evidence from which a jury *might return* a verdict

3  in his favor." *Anderson*, 477 U.S. at 257 (emphasis added).

4  **IV.  MCDONNELL DOUGLAS BURDEN SHIFTING STANDARD**

5    As set forth by the Supreme Court, the *McDonnell Douglas* test places the initial

6  burden on plaintiff to establish a *prima facie* case of discrimination.  *Guz v. Bechtel*

7  *Nat. Inc.* (2000) 24 Cal.4th 317.  In order to establish a *prima facie* case, plaintiff must

8  show that he was: 1) a protected member of the class; 2) qualified for the position he

9  sought or was performing competently in position he held; 3) he suffered an adverse

10  employment action, such as termination or demotion; and 4) some  circumstance

11  suggests discriminatory motive. *Id.* at 355.

12    California case law makes clear that "a plaintiff's *prima facie* burden is *minimal*.

13  The amount of evidence that must be produced in order to create a *prima facie* case is

14  very little." *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189,

15  197 (citations omitted) (emphasis added.)  "A plaintiff must show actions taken by the

16  employer from which one can infer, if such actions remain unexplained, that it is more

17  likely than not that such actions were "based on a [prohibited] discriminatory criterion.

18  The *prima facie* burden is *light;* the evidence necessary to sustain the burden is

19  *minimal.*" *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310 (internal

20  citations omitted) (emphasis added.)

21    Once a plaintiff establishes a *prima facie* case, a presumption that the employer

22  discriminated arises . . . The burden will then shift to the employer to rebut the

23  presumption by producing admissible evidence that its action was taken for a

24  legitimate nondiscriminatory reason.  *Guz*, 24 Cal.4th at 355-356.  If the employer

25  sustains this burden, the presumption of discrimination disappears.  *Id.* at 356.

26    The plaintiff then has the opportunity to "attack the employer's proffered

27  reasons as pretexts for discrimination, or to offer any other evidence of discriminatory

28  motive." *Id.*

1
2

## V.   PLAINTIFF HAS MADE A PRIMA FACIE SHOWING OF AGE DISCRIMINATION

3   Mr. Carper has clearly presented sufficient evidence to meet the light showing

4 required to establish a prima facie case of age discrimination.  KTLA does not appear

5 to challenge that Mr. Carper is in an age protected class (age 69) and that Mr. Carper

6 suffered an adverse employment action as he was terminated in December 2014.

7   Instead, KTLA appears to challenge whether Mr. Carper was performing

8 competently in the position he held.  Mr. Carper's burden for establishing a *prima*

9 *facie case* that he performed well is not burdensome.  *Berquist v. Washington Mut.*

10 *Bank* (5th Cir. 2007) 500 F.3d 344, 350 ("[A] plaintiff challenging his termination or

11 demotion ... can ordinarily establish a *prima facie* case of age discrimination by

12 showing that he continued to possess the necessary qualifications for his job at the time

13 of the adverse action."); *Slattery v. Swiss Reinsurance America Corp.* (2d Cir. 2001)

14 248 F.3d 87, 92 ("The qualification necessary to shift the burden to defendant for an

15 explanation of the adverse job action is minimal; plaintiff must show only that he

16 possesses the basic skills necessary for performance of [the] job.").  Moreover, as the

17 *Sandell* Court has explained:

18   [W]e agree that a plaintiff must demonstrate some basic level of competence at
his or her job in order to meet the requirements of a *prima facie* showing, the

19 burden-shifting framework established in *McDonnell Douglas* compels the
conclusion that any measurement of such competency should, to the extent

20 possible, be based on objective, rather than subjective, criteria . . . . . (See *White
v. Columbus Metro. Housing Authority* (2005) 429 F.3d 232, 243, fn. 6, citing,

21 e.g., *Vessels v. Atlanta Independent School System* (11th Cir.2005) 408 F.3d
763, 769 [any consideration of the employer's subjective criteria is not relevant

22 until the later stages of the *McDonnell Douglas* framework, because "[a]
contrary rule, under which an employer's subjective evaluation could defeat the

23 plaintiff's initial *prima facie* case, cannot be squared with the structure and
purpose of the *McDonnell Douglas* framework."].)  A plaintiff's burden in

24 making a *prima facie* case of discrimination is not intended to be onerous.

25 *Sandell,* 188 Cal.App.4th 297, 322 (emphasis added.)  Here, Mr. Carper has more than

26 ample evidence to show that he performed competently for the following reasons:

27   •   Mr. Carper has over 40 years of experience in selling TV advertisements

28     before  being  hired  at  KTLA  in  2009,  including  executive  and

15

management positions at ABC, UNIVISION, DDLA Inc., UVC, and KSLA Media.

- Mr. Kincaid declares under oath[5] that he pursued hiring Mr. Carper because of his prior decades of excellent performance: "I pursued the decision to hire Mr. Carper after I joined KTLA in 2009 because I believed he was an excellent performer as an account executive."

- Mr. Kincaid further declared that Mr. Carper was an excellent account executive: "Mr. Carper strived for the best client satisfaction, positive relationships with clients and internally with his sales team, timely in all respects, always prepared, and did whatever was necessary to excel as an account executive";

- Mr. Kincaid further declared that during his employment as Vice President of the Sales Department, he only recalls hearing one isolated incident regarding Mr. Carper's long e-mails which he reviewed and believed to be "blown out of proportion."

- Mr. Carper received praise from several of his accounts while employed as an account executive at KTLA including Davis Ross of Ross Advertising Inc., Candace Ross of Callan Advertising, and Kristen Werner of Far West Media.

In light of the Plaintiff's minimal requirements in establishing his *prima facie* burden, it is clear that Mr. Carper has established that he was performing competently.

KTLA also challenges whether Mr. Carper can demonstrate any evidence which suggests a discriminatory motive to rebut KTLA's legitimate business reason.

---

[5] Telling of the disputed facts regarding Mr. Carper's alleged performance issues, Mr. Kincaid's declaration was provided to Defendant over a month ago in March 2016 and Defendant has yet to subpoena Mr. Kincaid to testify at deposition.

## VI. PLAINTIFF HAS SUFFICIENT CIRCUMSTANTIAL EVIDENCE TO DEMONSTRATE A CAUSAL CONNECTION BETWEEN HIS AGE AND DEFENDANT'S TERMINATION

It is well settled that direct evidence of discrimination is rare and circumstantial evidence is the typical method of proof.  In most disparate treatment employment discrimination cases, the plaintiff will lack direct evidence of the employer's discriminatory intent.  *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138.  However, in the instant case, there is certainly a substantial amount of circumstantial evidence in this case, all of which points directly to KTLA's pretext.

The particular value of circumstantial evidence was stated in *Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90, when the Court recognized that direct evidence was rare stating  "We have often acknowledged the utility of circumstantial evidence in discrimination cases . . . . Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."  In most disparate treatment discrimination cases, plaintiff will have to rely on circumstantial evidence and the inferences that may be drawn from such circumstantial evidence. *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189.  In *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, the Court states:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.

*See also Guz,* 24 Cal.4th at 356.  As the Court will see below, Mr. Carper has an abundance of circumstantial evidence which creates triable issue of material fact at the current summary judgment stage.  Mr. Carper will prove such circumstantial evidence and Mr. Carper's claims should be decided by a trier of fact.

### A. MR. CARPER WAS REPLACED BY SUBSTANTIALLY YOUNGER EMPLOYEES

Evidence that an age-protected worker was replaced by a substantially younger person, or given more favorable treatment, may permit an inference of intentional age

17

discrimination. *Guz*, 24 Cal.4th at 367. "Characteristics of the employee replacing a discharged or demoted employee are certainly relevant in evaluating an employer's motive for an employment decision." *Heard v. Lockheed Missiles & Space Co.*, 44 Cal.App.4th 1735, 1756 (1996); *see also Begnal v. Canfield & Associates, Inc.,* 78 Cal.App.4th 66, 76 (2000).

Here, Ms. Schell and Mr. Harper began working at KTLA in February 2014, months prior to Mr. Carper being RIF'd due to budgetary concerns. Ms. Schell was 38 years old and Mr. Harper was 41 years old. Mr. Harper and Ms. Schell were given accounts that belonged to Mr. Carper at the time they were hired and additional accounts after Mr. Carper departed from KTLA in December 2014. KTLA's subsequent acts of hiring two individuals 30 years younger than Mr. Carper is circumstantial evidence of pretext.

## B.   MR. CORSINI'S REMARKS REGARDING MR. CARPER'S RETIREMENT

Statements were made during the scope of employment by senior decision-makers regarding an employees employment "were certainly relevant and, along with other substantial evidence, created a strong inference of intentional discrimination." *Mangold v. California Pub. Utilities Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995). In *Turcotte v. ABM Janitorial Servs.*, 2011 WL 1154486, at *3 (W.D. Wash.), plaintiff testified at her termination meeting she was told "because of her age, she would be able to retire and collect her social security." The court held "the comment suggests that Plaintiff's age was at least a motivating factor for the decision, and, as such, it would permit a jury to conclude that age was the 'but-for cause' of Plaintiff's termination." *Id.*

Further*, "*although stray remarks may not have strong probative value when viewed in isolation, they may corroborate direct evidence of discrimination or gain significance in conjunction with other circumstantial evidence. Certainly, who made the comments, when they were made in relation to the adverse employment decision,

18

and in what context they were made are all factors that should be considered." *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 541. Although stray remarks may fall short of establishing a prima facie case it may still be relevant circumstantial evidence of discrimination. *Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398, 402.

At Mr. Carper's meeting to notify Mr. Carper of his termination in December 2014, Ms. Lopez-Nash began the meeting by stating: "We assumed you wanted to retire, and if you do, Don Corsini wants to throw your retirement party." Mr. Carper was shocked by this comment and explained he had no intention of retiring. Further, in at least one e-mail after this August 2014 meeting, Mr. Corsini discusses Mr. Carper's layoff and mentions that Mr. Corsini is willing to throw Mr. Carper a "no-host retirement" party.

Mr. Corsini's remarks and Ms. Lopez-Nash's remarks regarding Mr. Carper's retirement at the time of Mr. Carper's termination meeting and after is circumstantial evidence of pretext. KTLA disputes this version of events claiming Mr. Carper "twists" the words of Ms. Lopez-Nash, such dispute simply demonstrates a triable issue of material fact.

### C.   KTLA'S LACK OF DOCUMENTATION

Failure to produce documents may create a strong inference that the defendant's actions were not legitimate and pretextual. *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976 *overruled on other grounds by Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644. In *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, the Court held that pretext was shown by the absence of *any* documentation confirming that a company hiring freeze was in place during the relevant time period. The Ninth Circuit concluded that "the fact a large company did not have a single memorandum, meeting notes, or other evidence of the alleged hiring freeze or financial difficulties leading to the alleged hiring freeze provided adequate circumstantial evidence that the hiring freeze did not exist." *Id.* at 1123.

In *Glenn-Davis v. City of Oakland* (9th Cir. 2005) 126 Fed.Appx. 375, plaintiff

19

was a female lieutenant who qualified for a captain promotion and was placed on an eligibility list.  Upon plaintiff informing defendant that she was pregnant, defendant claimed that no candidates would be promoted and implemented a promotion freeze. *Id.*  In line with the reasoning of the cases cited above, the court held that the absence of any evidence relating to this hiring freeze was pretext for racial discrimination.  *Id.*

Here, Mr. Corsini, Ms. Lopez-Nash, Mr. Weiner, Ms. Pouliopoulos, Ms. Tang, Ms. Ganier, and Mr. Duarte all testified that discussions regarding budgetary concerns in 2014 were all done verbally at weekly manager meetings.  Each testified that they are not in possession of or have any seen *any* e-mail, memorandum, or meeting minutes which would reflect budgetary concerns in 2014.  Mr. Weiner testified cost cutting measures included reducing overtime hours, reducing food and beverage expenses, and reducing repair expenses in all departments at KTLA.  Nevertheless, Mr. Weiner testified all these cost cutting measures were discussed only verbally and he has never seen a single e-mail, memorandum, or meeting minutes relating to these measures.

KTLA's lack of documentation is evidence or pretext.

## D.   KTLA'S ONE PERSON REDUCTION IN FORCE

KTLA's conduct of a one person RIF is in and of itself evidence of pretext.  As explained in *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000):

> We have held that the inference of discrimination arises in single-discharge cases, sometimes called 'mini-RIFs,' where the terminated employee's duties are absorbed by other employees not in the protected class.  The plaintiff in a single-discharge case does not need to make a showing that "similarly situated" employees were treated better because the inference of discrimination arises from the fact that they were constructively "replaced" by workers outside of the protected class. The point of the mini-RIF, unlike a true RIF, is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively "replaced," not eliminated.

(internal citation omitted.)   "When a 'reduction-in-force' includes only one employee—and the one employee is a member of a protected class—this is some evidence of pretext.  *Aludo v. Denver Area Council*, 2008 WL 3480079, at *5 (D. Colo.)

Ms. Lopez-Nash testified that Mr. Carper was the single non-union employee chosen for a layoff, a one person Reduction-In-Force ("RIF") due to budgetary reasons at KTLA. Ms. Lopez-Nash further testified that no other non-union employees were RIF'd during KTLA's striking down year in 2014. Ms. Ganier testified that during her ten (10) years of being employed at KTLA, she was not aware of a *single* other employee being subject to a RIF due to budgetary concerns. Mr. Corsini testified that throughout his duration of being President, he could not recall ever laying of a single account executive from the Sales Department due to budgetary concerns. No other account executive in the sales department was ever considered for the RIF.

## E.   KTLA'S FAILURE TO FOLLOW ITS OWN POLICIES AND PROCEDURES

Defendant's failure to follow its own express policies is evidence of pretext. *Stewart v. Rutgers*, *The State University* (3d Cir. 1997) 120 F.3d 426, 434 (arbitrary and capricious decision making, coupled with procedural errors, constitutes evidence of pretext); see *Garrett v. Hewlett-Packard Co.* (10th Cir. 2002) 305 F.3d 1210, 1220 ("disturbing procedural irregularities can satisfy the requirements of a pretext claim") (citing *Mohammed v. Callaway* (10th Cir. 1983) 698 F.2d 395, 400); *see also Russell v. TG Missouri Corp.* (8th Cir. 2003) 340 F.3d 735, 746 ("We agree . . . that an employer's deviation from its own policies can, in some instances, provide evidence of pretext.").

It may be found that evidence of pretext exists when a defendant's actions are inconsistent with its description of its own process. *Hill v. Seaboard Coast Line R. Co.* (11th Cir. 1989) 885 F.2d 804, 810 ("[Defendant's] explanation was inconsistent with his description of the promotion process in general and with the specific circumstances of earlier promotion decisions."). A defendant who made an adverse employment decision not even aware of its own policy could be viewed as not making a legitimate disciplinary action. *Christie v. Foremost Ins. Co.* (7th Cir. 1986) 785 F.2d 584, 586.

Here, KTLA predicates much of its claim of poor performance on a "Last and

Final Written Warning" in November 2013 from Mr. Duarte which was never given to Mr. Carper.  Ms. Lopez-Nash testified that throughout her entire employment at KTLA, she could not think of a single other employee who was issued a "Last and Final Written Warning" without being given to an employee for their signature.  Mr. Kincaid declares he is familiar with KTLA's policies and procedures and it would be against KTLA's policies and procedures "to issue an employee a document as crucial as a final warning without ever giving it to an employee."

## VII.  <u>PLAINTIFF'S PUBLIC POLICY CLAIM SURVIVES</u>

Defendant's only argument for dismissal of Plaintiff's cause of action for violation of public policy is because Plaintiff's age claim should be dismissed. However, as Plaintiff has stated at length above, there is ample evidence supporting Plaintiff's claims for age and numerous triable issues of material fact exist.

## VIII.  <u>PLAINTIFF'S CLAIM OF PUNITIVE DAMAGES SURVIVES</u>

Defendants argue that Mr. Carper cannot demonstrate that Defendant subjected Mr. Carper to any fraudulent, malicious, or oppressive conduct.  In *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 220-21, the court stated:

> The policy that promotes the right to seek and hold employment free of prejudice is fundamental. Job discrimination "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general." (§ 12920.) The statute's aim is to provide effective remedies against the evil.
>
> . . . .
>
> Absent a convincing statement of contrary legislative intent, we rule that, in a civil action under the FEHA, all relief generally available in noncontractual actions, *including punitive damages*, may be obtained.

(emphasis added.)  Whether to award punitive damages is a question for the jury to determine.  *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1658 ("Whether to award punitive damages and how much to award were issues for the jury.")

At the current stage of summary judgment, this Court, drawing all reasonable inferences in favor of Mr. Carper should not decide this issue as a matter of law.

22

*Erdmann v. Tranquility Inc.* (N.D. Cal. 2001) 155 F.Supp.2d 1152, 1167 ("The Court cannot say at this stage of the proceeding, where it is required to draw all reasonable inferences in favor of the plaintiff, that no reasonable jury could conclude based upon the evidence presented by [plaintiff] that [defendant'] acts [in violation of FEHA] were despicable and taken in conscious disregard of Plaintiff's rights.")

As a result, the Court should not adjudicate Plaintiff's claim for punitive damages as a matter of law.

## IV.   PLAINTIFF DOES NOT DISPUTE THAT TRIBUNE MEDIA WAS NOT PLAINTIFF'S EMPLOYER

Plaintiff does not challenge the Court's summary adjudication that Tribune Media was not Plaintiff's employer.

## X.   AFTER ACQUIRED EVIDENCE SHOULD NOT BE GRANTED

"The 'after-acquired evidence' doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later "discovers" evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070 (9th Cir. 2004). KTLA has the "burden of proof with respect to this issue on the employer, carefully articulating that the employer must establish not only that it *could* have fired an employee for the later-discovered misconduct, but that it *would* in fact have done so." *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996).

Here, KTLA cannot meet that burden at the summary judgment stage. With regard to the Kevin Jewelers account in October 2014 for changes to occur in November/December 2014, it is clear that Mr. Carper properly changed the November advertisement slots. Mr. Carper was unsure if he changed the December advertisement slots, but explained at his deposition "But I confirmed it. So I think that would have been done." In addition, Ms. Tang testified that Mr. Carper gave an update on each of his accounts before he left KTLA in 2014, but that she could not recall if Mr. Carper ever gave Ms. Tang an update on the Kevin Jewelers account.

1  Prior to budgetary concerns in 2014, despite Mr. Carper's performance issues,

2  including alleged argumentative e-mails, long e-mails, and poor client service, Ms.

3  Pouliopoulos, Ms. Tang, Mr. Duarte, and Ms. Ganier have never once recommended

4  Mr. Carper for termination due to performance deficiencies.  The *O'Day* Court stated

5  that in evaluating an after-acquired evidence defense, "common sense" must be

6  exercised.  O'Day, 79 F.3d at 762 (9th Cir. 1996).  It defies logic and common sense

7  for Ms. Pouliopolos to credibly claim she found Mr. Carper's e-mails allegedly

8  unacceptable for nearly five (5) years of his employment but never recommend him for

9  termination, yet now claim if she saw this specific e-mail she would have terminated

10  Mr. Carper.

11  **XI.  CONCLUSION**

12  For the foregoing reasons, Plaintiff respectfully requests the Court deny

13  Defendants' Motion for Summary Judgment.

14

15  Dated: May 2, 2016                    LAW OFFICES OF VICTOR L. GEORGE

16

17                                                          */s/ Elvis Tran*
                                            By: _____
18                                               VICTOR L. GEORGE
                                                 ELVIS TRAN
19                                               Attorneys for Plaintiff
                                                 DONN CARPER

20

21

22

23

24

25

26

27

28

24