1  Victor L. George, State Bar No. 110504
   Wayne C. Smith, State Bar No. 122535
2  Elvis Tran, State Bar No. 281620
   LAW OFFICES OF VICTOR L. GEORGE
3  20355 Hawthorne Blvd., First Floor
   Torrance, California 90503
4  Telephone: (310) 698-0990
   Facsimile: (310) 698-0995
5  E-Mail: vgeorge@vgeorgelaw.com

6  Attorneys for Plaintiff,
   DONN CARPER
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  DONN CARPER,                        CASE No. CV15-04259 VAP (SSx)
                                        [Assigned to the Virginia A. Phillips,
12             Plaintiff,               Courtroom 780]

13      v.                              **PLAINTIFF'S RESPONSE TO**
                                        **DEFENDANTS' STATEMENT OF**
14  TRIBUNE MEDIA, a business, form     **UNDISPUTED FACTS AND**
    unknown; KTLA, LLC, a business,     **CONCLUSIONS OF LAW**
15  form unknown, and DOES 1 through
    100, inclusive,
16
               Defendants.             [Filed concurrently with:
17                                      1. Plaintiff's Opposition to Defendants'
                                           Motion for Summary Judgment;
18                                      2. Declaration of Mike Kincaid;
                                        3. Declaration of Elvis Tran, Esq.]
19

20                                      Date:   May 23, 2016
                                        Time:   2:00 p.m.
21                                      Crtrm:  780

22

23                                      Complaint filed:  April 23, 2015
                                        Trial Date:       August 9, 2016
24

25

26  ///

27  ///

28  ///

                                        1

Plaintiff DONN CARPER hereby submits the following Response to Defendant's Statement of Undisputed Facts and Conclusions of Law in Opposition to Defendants' Motion for Summary Judgment or, in the Alternative Partial Summary Adjudication.

**Age Discrimination (First Cause of Action)**

**Issue 1:** Plaintiff's first cause of action for age discrimination in violation of the Fair Employment and Housing Act ("FEHA") fails as a matter of law as to Defendants because Plaintiff cannot show a prima facie case of discrimination.

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 1. | Throughout his career, Carper sold television advertisements for various television stations. | Carper Dep. 15:1-6, 17:20-24,21:13-20 | Undisputed. |
| 2. | Carper worked for ABC from 1974 - 1986, which is where he met, and developed friendships with Don Corsini and Mike Kinkaid. | Carper Dep. 23:8-10, 26:15-17, 26:24-27:1; Deposition of Don Corsini ("Corsini Dep.") 121:17-21 | Undisputed. |
| 3. | In July 2009, Carper had been unemployed for over nine months after having been terminated from CBS and had no job offers. | Carper Dep. 31:24-32:1, 37:25-38:3 | Disputed. Mr. Carper's job of Vice President of Business Development at CBS was eliminated. Mr. Carper was not terminated. Deposition of Don Carper ("Carper Dep.") 15:20-16:3 |
| 4. | Corsini was the President and General Manager of KTLA, and Kinkaid was KTLA's Vice President of Sales. | Deposition of Mary Pouliopoulos ("Pop Dep.") 56:25-57:3, 62:18-19 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 5. | Kinkaid advocated for Carper's hire at KTLA to help him out. | Deposition of Patti Tang ("Tang Dep.") 23:6-24:10; 29:1-30:3 | Disputed. Mr. Carper was hired due to his track record of good performance. (Kinkaid Decl. at 2-4.) |
| 6. | Patti Tang, who was KTLA's General Sales Manager before taking a position as a Local Sales Manager, did not want to hire Carper. | Tang Dep. 23:19-24:10 | Disputed. Ms. Tang did not provide any disagreement about Mr. Carper's hiring at KTLA. (Kinkaid Decl. at 2-4.) |
| 7. | Patti had worked with Carper at KCBS and testified about her impression that AEs who worked under Carper "felt like he complicated situations and they could not get business done." | Tang Dep. 16:3-18:20 | Undisputed. |
| 8. | Kinkaid told Patti that he and Carper had been "longtime friends" and that "he was not going to let him go down financially. " | Tang Dep. 23:6-24:10, 29:1-30:3 | Disputed. Mr. Kincaid only informed Ms. Tang that Mr. Carper would be hired and Ms. Tang provided no disagreement. (Kinkaid Decl. at 2-4.) |
| 9. | Corsini initially did not want to hire Carper because he perceived him as having had work-related issues at KCBS and being difficult to manage. | Corsini Dep. 18:4-12, 19:11-18, 20:8-13, 50:13-51:4 | Disputed. Mr. Corsini did not provide any disagreement in the decision to hire Mr. Carper. (Kinkaid Decl. at 3.) |
| 10. | However, Kinkaid convinced Corsini that Kinkaid "Would manage him [Carper] to the best of his abilities, and for me not to worry about any issues." | Corsini Dep. 10:11-23,55:7-11, Errata; Carper Dep. 36:25-37:6 | Disputed. Mr. Corsini did not provide any disagreement in the decision to hire Mr. Carper. (Kinkaid Decl. at 3.) |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | |
| 11. | Carper was hired as an Account Executive CAE") and was 64 years old at the time of his hire at KTLA. | Carper Dep. 34:6-9, 37:9-11 | Disputed. Mr. Carper was 63 years old at the time of his hire at KTLA. Carper Dep. 27:23-24, 31:22-23 |
| 12. | AEs report to Local Sales Managers ("LSMs"), who report to the General Sales Manager, who reported to Kincaid before Kinkaid left KTLA. | Pop Dep. 15:9-17,18:8-13 | Undisputed. |
| 13. | The LSMs during Carper's employment were Troy Arce Ganier, Patti Tang, and Jozef Duarte. | Carper Dep. 49:9-22 | Disputed. Nancy Caldwell and Mary Pouliopoulos were also LSMs during Mr. Carper's employment. Carper Dep. 48:21-49:1; Deposition of Mary Pouliopoulos ("Pouliopoulos Dep.") 16:4-14 |
| 14. | Mary Pouliopoulos was hired by KTLA in July 2009 - the same month and year as Carper. | Pop Dep. 16:4-6 | Undisputed. |
| 15. | Mary initially was a LSM, and then was promoted to General Sales Manager six to nine months later. | Pop Dep. 16:8-21 | Undisputed. |
| 16. | Corsini is 68 years old, and Mary is 52 years old. | Corsini Dep. 10:17-19; Pop Dep. 13:4-8 | Disputed. At the time of Mr. Carper's termination, Ms. Pouliopoulos was substantially younger than Mr. Carper at 51 years old, and Mr. Corsini was 66 years. Pouliopoulos Dep. 13:7-8; Deposition |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | of Don Corsini ("Corsini Dep.") 10:17-19 |
| 17. | In addition, all of the LSMs are in the protected age group: Patti is 56 years old, Troy is 54 years old and Jozef Duarte is 42 years old. | Tang Dep. 11:7-9; Deposition of Troy Arce Ganier ("Ganier Dep.") 12:8-10; Deposition of Jozef Duarte ("Duarte Dep.") 67:16-17 | Disputed. At the time of Mr. Carper's termination, Mr. Duarte was 41 years old, Ms. Ganier was 53 years old, and Ms. Tang was 54 years old. Deposition of Jozef Duarte ("Duarte Dep.") 67:16-17; Deposition of Patti Tang ("Tang Dep.") 11:7-9; Garner Dep. at 12:8-10. |
| 18. | The Human Resources Director, Barbara Lopez-Nash, is 62 years old. | Deposition of Barbara Lopez Nash ("Nash Dep.") 145:5-11 | Disputed. At the time of Mr. Carper's termination, Ms. Lopez-Nash was 61 years old. Deposition of Barbara Lopez Nash ("Nash Dep.") 145:5-11 |
| 19. | Carper began displaying performance issues early on in his employment. | Pop Dep. 41:16-42:9; Corsini Dep. 57:7-15. | Disputed. From Mr. Carper's hire date in 2009 to Mr. Kincaid's departure from KTLA, Mr. Kincaid only heard one isolated comment regarding the length of Mr. Carper's e-mails. Mr. Kincaid himself reviewed the e-mail and believed "length was a non-issue and blown out of proportion." |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | (Kinkaid Decl. at 4.) |
| 20. | In his 2010 performance evaluation, Carper received an overall rating of: "Needs Improvement." The evaluation notes that "Donn needs to work on communication skills both internally and externally and limit surprises, over promising and managing expectations. Also needs to cut down lengthy email communications.... Donn vacillates between being an amazing role model during good times and disrespectful during high pressure situations." | Pop Dep. 46:21-47:5, Ex. 9; Tang Dep. 65:15-67:2, Ex. 9 | Undisputed. |
| 21. | Carper does not believe that performance documentation was given to him because of his age. | Carper Dep. 77:14-17, 87:13-17 | Undisputed. |
| 22. | In November 2012, Carper was issued a document entitled: "Insubordination! Written Warning." The document notes that Carper's communications style was too long and combative in tone; references Carper's defiance of an instruction not to email a client about ratings; notes another client's request that Carper be taken off an account due to "long-winded emails" and the fact that Carper would "battle repeatedly" with her over the telephone. The document also notes that Carper emailed this client after being taken off the account in contravention of his | Carper Dep. 66:3-9, 84:8-13, Ex. 5 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | supervisor's directive. The written warning ended by stating that "this is a very long standing problem that needs immediate and sustained attention. Failure to adhere to the directives in this document will lead to further disciplinary action which could and probably will include termination." | | |
| 23. | Performance evaluations were not done in 2011 and 2012 when KTLA was in bankruptcy. | Nash Dep. 155:3-17 | Undisputed. |
| 24. | In July 2013, Carper received his 2013 mid-year evaluation. The evaluation includes the following comments regarding areas requiring improvement:<br>• "Donn needs to focus on growing revenue by maximizing rates as opposed to going for share with lower rates." "Would like to see "Donn create and sell through more NTR opportunities."<br>• "Donn needs to work on his ability to understand the client's perspective and not try to force his perspective on the client to the point of aggravation."<br>• "Additionally, he needs to work on his ability to listen to the client while still representing the interests of the station. He often takes the client side to the point of conflict."<br>• "Donn also needs to reduce the content of his emails and be more | Carper Dep. 78:2-4, 17-19, Ex. 8 | Undisputed. |

| | DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|---|
| | | succinct when communicating both internally and externally." • "Donn can be difficult to deal with when he becomes adamant that his way is correct and verbose in his communication. It is frustrating to both internal and external clients." • "Donn needs to improve his responsiveness to management requests. Often when asked to adjust schedules and maximize inventory, Donn is reluctant to help." | | |
| | 25. | In November 2013 a "Last and Final Warning" was prepared for issuance to Carper. The document notes "19% less buy" from a client due to Carper's failure to communicate in a meaningful way with the client, Carper's lack of preparation for a meeting, and the client asking that Carper be removed from the account. | Nash Dep. 47:14-19, Ex. 6; Duarte Dep. 56:14-15, 58:24-25, 60:7-25, 61:8-10 | Disputed. Mr. Carper was never given or had ever seen the unsigned "Last and Final Written Warning" until after he was already terminated from KTLA. Carper Dep. 66:10-16 |
| | 26. | While the November 2013 "Last and Final Warning" may not have been given to Carper, Carper admits that he was taken off the account as reflected in the warning document, and that Jozef Duarte was not happy with him following the meeting referenced in the warning document. | Carper Dep. 66:14-16, 67:20-68:22 | Disputed. Mr. Carper was never given or had ever seen the unsigned "Last and Final Written Warning" until after he was already terminated from KTLA. Carper Dep. 66:10-16 |
| | 27. | Carper's 2013 year-end performance evaluation gave him a rating of 1.5 ("Do Better") out of 3.0, | Carper Dep. 70:8-19, Ex. 7 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | and notes the following: • "Would like to see Donn achieve target revenue goals. His 2013 goal was 15% off target." • "Donn has challenges with agencies that have asked to have him removed. He needs to find new accounts to develop to replace the lost business." • "Donn needs to work on his ability to understand the client's perspective and not try to force his perspective on the client to the point of aggravation. "Additionally, he needs to work on his ability to listen to the client while still representing the interests of the station. He often takes the client side to the point of conflict." • "Donn also needs to reduce the content of his emails and be more succinct when communication both internally and externally." "Although I have seen Donn strive to limit his emails, he needs to continue to improve on his communication skills and in reading the response of the person across the desk from him." | | |
| 28. | 1.5 was the lowest rating given to any AE in the 2013 year-end evaluations. | Pop Dep. 78:18-79:2 and Errata | Undisputed. |
| 29. | Carper admits that he was taken off accounts at clients' requests. | 67:20-24, 70:20-71:4, 74: 10-12, 255:23-256:5 | Disputed. Mr. Carper explained that he was not taken off the San Antonio Winery |

9

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | Account. Carper Dep. at 74:21-23. |
| 30. | Patti Tang had the following impressions of Carper during the time that she worked with him at KTLA: "I felt like he overcomplicated situations. He sent very lengthy e-mails with superfluous information that was not pertinent to the situation. I think that frustrated our clients. I felt like he would come in to do negotiations unprepared. I would always require one-year history and he didn't always have that. In fact, I started keeping files so that I could pull it out myself when we negotiated. He had a lack of knowledge of our systems. He didn't know how to use Wide Orbit effectively. He did not know how to use Excel. He repeatedly ignored my request to learn. I felt like he did not include me as his manager on his account activity. There was an instance where a new buyer came to town and I wasn't told about it until after he met them for dinner. I had requested meetings with agencies and it took him a long time to get them. In fact, one time he told me that I didn't need to go to the agency, that he needed to go and have a man-to-man conversation with the owner of the agency. I found working with him very frustrating." | Tang Dep. 33:1-34:1, 38:16-39:22, 40:16-23, 41:10-46:3 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Tang's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 31. | Troy Arce Ganier testified regarding what she perceived to be "problems" that she had when supervising Carper, and that these "problems" were ongoing throughout his employment, and that he was "more challenging" than the other AEs. | Ganier Dep. 30:12-18, 34:1-5 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 32. | Troy felt that Carper "would operate without bringing me, as a manager, up to speed on exactly what he was doing with an account." | Ganier Dep. 30:19-31:12, 34:10-16; 41:743 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 33. | In July 2014, Troy learned that Carper had been working for some time on a project with Station Manager, John Moczulski, without informing her. When she asked Carper about it, Carper claimed that he was responding to Moczulski's requests. However, Moczulski told Troy that Carper had approached him about the | Gather Dep. 131:23-134:24, Ex. 62 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | project. | | |
| 34. | Carper admits that Troy was upset with him because she felt that he was "operating behind her back" by working with a high level KTLA executive on a project and not keeping her informed. | Carper Dep. 168.22-169:18, 170:3-16, 175:5-13, Ex. 27 | Undisputed. |
| 35. | Carper testified that it was important to keep his manager informed regarding communications with clients. | Carper Dep. 54:7-13 | Undisputed. |
| 36. | The language of the written reprimand that Troy proposed sending to Carper was forwarded by Mary to Don Corsini. Corsini replied "Oh brother" and testified that this was a reference to "here we go again with more issues from Donn." | Corsini Dep. 75:21-76:13, Ex. 61 | Undisputed. |
| 37. | Troy also felt that Carper did not follow "procedure" with respect to submitting reports on time, and being prepared when he requested approval for rates. | Ganier Dep. 30:19-31:12, 34:10-16 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 38. | Tory felt that Carper needed to develop proficiency with, and use, KTLA's internal systems such as WideOrbit (the | Ganier Dep. 32:14-22 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | internal inventory system) and Excel and Powerpoint so that he could put together presentations and submit accurate reports such as quarterly budget projections and quarterly commissions reports. | | as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 39. | One assistant works with multiple AEs, so if a single AE relies fully on the assistant, for systems such as Excel, it impacts the others. | Ganier Dep. 63:9-17, 65:19-66:3 | Undisputed. |
| 40. | Troy received phone calls from clients about Carper asking her to intervene and help. | Ganier Dep.31:3-10 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 41. | Client complaints to Troy about Carper included "harassing phone calls" and "stalking" by Carper, Carper being "argumentative" and "difficult," and "that his emails were, 'out of control'" and that a client "could not get her " work done and that she felt she asked for simple | Ganier Dep. 45:23-46:8, 55:24-56:17, 89:2-90:2 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | information and that Mr. Carper replied with responses that were off topic and that she did not want to continue working with him as her KTLA account executive." | | Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 42. | A client told Troy that after Carper was removed from the account at the client's request, that Carper had called her, despite the instruction that he not contact her again. | Ganier Dep. 124:3-24 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 43. | Another client complained to Troy about "Carper's tactics at the agency and that he would go around the person he was supposed to interact with on a daily basis and reach out to other people within the agency that -- and he had been asked not to do that but had continued in certain 15 situations." | Ganier Dep. 49:7-50:11, 51:9-17 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 44. | Another client told Troy that she had "pulled back from dealing with the KTLA sales department based on her interactions | Ganier Dep. 48:4-11 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | with Carper." | | as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 45. | In addition to client complaints regarding Carper making business difficult with his off-topic, unnecessarily lengthy, and confusing emails, there were internal complaints as well. Troy received calls from the Creative Services Department, and also heard complaints from the other LSMs. | Ganier Dep. 67:9-69:16, 79:14-81:15 | Disputed in part. Undisputed that Ms. Tang testified to this effect. However, disputed as to whether Ms. Tang had those impressions during the time she worked with Mr. Carper, since Mr. Kincaid, who is Ms. Ganier's superior, only heard one isolated comment. (Kinkaid Decl. at 4.) |
| 46. | Troy told General Sales Manager Mary Pouliopou1os about the client complaints, and also told Mary that she felt that Carper would withhold information about problems with clients until the point where the client was upset and frustrated and future business could be affected. | Ganier Dep. 53:3-54:18 | Undisputed. |
| 47. | The client contact at Living Spaces told Jozef Duarte that while they did not want to hurt Carper and could "tolerate" him, | Duarte Dep. 18:6-15,20:10-23:7, 27:22-28:15 | Undisputed. |

15

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | they would prefer to work with someone else, and ultimately requested that AE Claudia Schell be assigned to the account. | | |
| 48. | After Claudia Schell took over the Living Spaces account, the business more than doubled. | Duarte Dep. 30:10-16 | Undisputed. |
| 49. | Jozef was frustrated with his perception that Carper could not use Excel. He testified: "I was getting frustrated with the fact that he couldn't take the offer and put it in an Excel spreadsheet. ... I wanted the formulas to be workable so that when you input the amount of spots and the rate, everything would tabulate. And I remember having a situation where it took hours to get that, and it was wrong. So I finally did it myself." | Duarte Dep. 19:9-19 | Undisputed. |
| 50. | Jozef believed that Carper did not take responsibility for a meeting that went badly with client MJA, and instead, blamed Jozef. Jozef testified: "I felt that he didn't defend the station. I felt that things that he was talking about were irrelevant. There was one situation that really bothered me where he ... was giving their support staff compliments in a meeting when they were complaining that we didn't do enough. So instead of talking about all the things we were doing for them, he was telling them how one of the girls in their office is | Duarte Dep. 32:20-33:16 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | great and answers immediately, and it was very inappropriate to the conversation we were having. And then I felt he didn't take responsibility because I was doing most of the talking after that. . . . I had become the mouthpiece, and I was doing his job." | | |
| 51. | Jozef testified about how the client at MJA complained about Carper's rambling mails and that Carper was sending them irrelevant information. The client "called him [Carper] a rookie" and said "I don't want this rookie on my shop." | Duarte Dep. 34:5-35:19 | Undisputed. |
| 52. | Jozef testified about how the MJA client told him that they would not be giving KTLA any advertising money, that the client wanted Carper off the account immediately, and that the client opined that Carper was "illprepared" for a meeting. | Duarte Dep. 60:20-25 | Undisputed. |
| 53. | Carper's counsel deposed Michael Cunio, the President of MJA, who confirmed that their liaison complained that Carper "would drive her crazy by not sticking to the facts of what she was asking." Cunio confirmed that because Carper was not prepared for a meeting, they decided that KTLA would get "zero" dollars in advertising, and that they communicated that they | Deposition of Michael Cunio 7:24-8:4, 13:18-24, 14:13-25,15:1-16:9, 20:11-14, 23:1-23:22, Ex 1 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | wanted Carper off of their account. | | |
| 54. | Human Resources Director Barbara, Lopez-Nash testified that LSMs came directly to her to complain about Carper, that Mary Pouliopoulos spoke with her regarding frustrations with managing Carper, and that she agreed that written discipline should be given because verbal counselling had not been effective. | Nash Dep. 9:2-10:3, 25:21-28:12, 32:2-19,33:15-34:4, 44:17-46:25, 57:5-14,58:21-59:3, 62:6-14, Exs. 5, 27,56 | Undisputed. |
| 55. | Carper was a regular topic of conversation during managers meetings, during which managers expressed frustrations with him. | Ganier Dep. 74:3-15; Tang Dep. 47:21-49:25, 50:17-19,51:9-19, 68:12-14; Duarte Dep. 84:9-21, 86:18-22, 89:18-90:17, 99:11-23 | Disputed. Mr. Kincaid took part in manager's meetings from the time Mr. Carper was hired until Mr. Kincaid departed from KTLA and only heard one isolated negative comment about Mr. Carper. (Kinkaid Decl. at 4.) |
| 56. | The LSMs did not perceive Carper as being a "team player" by helping them manage inventory by moving spots out of the latter part of a month to openings in the early part of a month. | Duarte Dep. 52:5-53:11, 54:18-55:8; Tang Dep. 77:12-78:6 | Disputed. Mr. Kincaid took part in manager's meetings from the time Mr. Carper was hired until Mr. Kincaid departed from KTLA and only heard one isolated negative comment about Mr. Carper. (Kinkaid Decl. at 4.) |
| 57. | Kincaid left KTLA in February 2013. | Corsini Dep. 21:15-19 | Undisputed. |
| 58. | After Kincaid's departure, Mary Pouliopoulos began | Corsini Dep. 21:20-23:1 | Undisputed. |

18

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | to report to Corsini directly, and Corsini began hearing more from Mary and the LSMs about Carper's performance issues. | | |
| 59. | Mary Pouliopoulos kept Corsini informed regarding Carper's continuing performance issues. Mary testified: "there was a friendship there, so I was sure to communicate with him that I would be, you know, concerned that he would be displeased with the fact that we were having issues with Donn Carper, because he [Corsini] wanted that [Carper's employment] to succeed." | Pop Dep. 27:17-28:1; 42:4-9, 42:21-42:4; 44:14-25; 52:10-19, 54:25-55:5, 58:3-16, 62:11-63:5, 66:13-67:19, 71:21-72:11, 73:12-17 | Disputed. Mr. Corsini would only learn about Mr. Carper's performance issues "in passing." Corsini Dep. 23:7-16 |
| 60. | With the growth of the Internet and cable television, advertising revenue for local television stations, such as KTLA, has been steadily declining. | Declaration of Don Corsini ("Corsini Dec.") § 2 | Undisputed. |
| 61. | This decline has been exacerbated for KTLA in light of the fact that advertising buyers have been devoting a greater share of advertising "spend" to sports; and KTLA has no sports programming. | Corsini Dec. § 2 | Undisputed. |
| 62. | KTLA has been competing for a share of a constantly shrinking market. | Corsini Dec. § 2 | Undisputed. |
| 63. | KTLA operates on a calendar fiscal year. | Corsini Dec. § 3 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 64. | Business plans and budgets for each calendar year are prepared beginning in July/August of the prior year. After coming off of a good 2013, 2014 started out poorly and only grew worse as the year progressed. | Pop Dep. 32:5-9; Nash Dep. 64:11-16; Ganier Dep. 72:9-13; Tang Dep. 55:6-9; Corsini Dep. 28:9-17 and Errata; Corsini Dec. § 3 | Disputed in part. There is no e-mail, memorandum, or written documentation between Mr. Corsini, Ms. Pouliopoulos, or any of the LSMs that demonstrate any type of budgetary issues in 2014. In fact, KTLA's Person Most Knowledgeable himself even testified that he has never seen a single e-mail, memorandum, or written document to watch expenses or to employ any cost cutting measures. Mr. Weiner likewise testified that all conversations about cost cutting measures were all done verbally at weekly "managers meetings." Corsini Dep. 28:9-29:8; Weiner Dep. at 44:9-46:6 |
| 65. | At the end of Q1 2014, KTLA was $2.2 million under budget projections, and by the time that 2015 budget preparations began in early August 2014, KTLA was more than $5 million behind its revenue goals. | Corsini Dep. 28:9-19, 121:10-16 and Errata | Disputed in part. There is no e-mail, memorandum, or written documentation between Mr. Corsini, Ms. Pouliopoulos, or any of the LSMs that demonstrate any type of budgetary issues in 2014. In fact, KTLA's Person |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | Most Knowledgeable himself even testified that he has never seen a single e-mail, memorandum, or written document to watch expenses or to employ any cost cutting measures. Corsini Dep. 28:9-29:8; Weiner Dep. at 44:9-46:6 |
| 66. | During the first half of 2014, department heads were informed that the station was struggling, that they needed to watch their expenses, and that there would be significant cost cuts for the 2015 budget. | Pop Dep. 32:7-18; Nash Dep. 80:2-11; Ganier Dep. 148:16-149:25; Tang Dep. 36:17-21 | Disputed in part. There is no e-mail, memorandum, or written documentation between Mr. Corsini, Ms. Pouliopoulos, or any of the LSMs that demonstrate any type of budgetary issues in 2014. In fact, KTLA's Person Most Knowledgeable himself even testified that he has never seen a single e-mail, memorandum, or written document to watch expenses or to employ any cost cutting measures.  Corsini Dep. 28:9-29:8; Weiner Dep. at 44:9-46:6 |
| 67. | The sales department specifically was instructed to be conservative with the travel and entertainment expenses for the sales force. | Ganier Dep. 75:1-76:11; Corsini Dep. 28:22-29:3 | Disputed in part. There is no e-mail, memorandum, or written documentation between Mr. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | Corsini, Ms. Pouliopoulos, or any of the LSMs that demonstrate any type of budgetary issues in 2014. In fact, KTLA's Person Most Knowledgeable himself even testified that he has never seen a single e-mail, memorandum, or written document to watch expenses or to employ any cost cutting measures. Corsini Dep. 28:9-29:8; Weiner Dep. at 44:9-46:6 |
| 68. | 2015 was not an election year in California - there was no U.S. House races, no state executive races, no state house or senate races, and no statewide or local ballot measures. Thus, there was no "political spend" anticipated for 2015, which was another factor taken into consideration when the 2015 budget was prepared. | Corsini Dec. § 4 | Undisputed. |
| 69. | In late July/early August 2014, Corsini and Mary had a discussion about the 2015 sales budget, and where cuts could be made for 2015. | Pop Dep. 21:21-22:9 | Disputed in part. There is no e-mail, memorandum, or written documentation between Mr. Corsini, Ms. Pouliopoulos, or any of the LSMs that demonstrate any type of budgetary issues in 2014. In fact, |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | KTLA's Person Most Knowledgeable himself even testified that he has never seen a single e-mail, memorandum, or written document to watch expenses or to employ any cost cutting measures. Corsini Dep. 28:9-29:8; Weiner Dep. at 44:9-46:6 |
| 70. | They decided to eliminate one AE position for 2015, and decided that the person eliminated would be Carper. | Pop Dep. 19:17-20, 21:6-10, 23:14-18; Corsini Dep. 31:1-10, 31:23-18, 32:23-33:15 | Undisputed. |
| 71. | Mary explained the decision that Carper would be the AE selected for position elimination as follows: "[W]e discussed performance specifically of Donn Carper, the three prior quarters he had missed his revenue goals, we were having issues with clients that had asked him to be removed from their agencies, we were having issues with clients complaining about his combativeness, his lengthy e-mails, lack of cooperation, not providing information. And then internally all three managers had indicated on a number of accounts that he was not informing them of information related to his accounts, that he was combative, that his e-mails were lengthy, that | Pop Dep. 23:18-19:9, 25:20-25, 29:11-17, 94:10-24 | Disputed.  From Mr. Carper's hire date in 2009 to Mr. Kincaid's departure from KTLA, Mr. Kincaid only heard one isolated comment regarding the length of Mr. Carper's e-mails. Mr. Kincaid himself reviewed the e-mail and believed "length was a non-issue and blown out of proportion." (Kinkaid Decl. at 4.) |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | he was uncooperative, and that although they had spoken with him, it was not improving his performance. And so Donn Carper was selected based on the budgetary and performance issues. ... We discussed selecting Donn because it was very clear that based on the ongoing issues that we had been having, revenue issues, external issues with clients and internal issues with performance, that he was the clear and obvious choice for elimination." | | |
| 72. | Carper missed his sales goals for Q4 2013, and for Q1 and Q2 2014. | Declaration of Mary Pouliopoulos ("Pop Dec.") § 2 | Disputed in part. Mr. Carper does not dispute that he did not meet his sales goals in Q1 and Q2 of 2014, but it is because Mr. Carper had multiple accounts taken from him and given to Mr. Harper and Ms. Schell, the two account executives who started at KTLA in February 2014.  Specifically, Mr. Carper's Living Spaces account was taken from him and given to Ms. Schell.  This account grossed Mr. Carper over $1,000,000 of sales per year. Carper Dep. 72:13-73:4, 202:3-15 |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 73. | Carper was the only AE who missed his goals for these three consecutive quarters. | Pop Dec. § 2 | Disputed in part. Mr. Carper does not dispute that he did not meet his sales goals in Q1 and Q2 of 2014, but it is because Mr. Carper had multiple accounts taken from him and given to Mr. Harper and Ms. Schell, the two account executives who started at KTLA in February 2014. Specifically, Mr. Carper's Living Spaces account was taken from him and given to Ms. Schell. This account grossed Mr. Carper over $1,000,000 of sales per year. Carper Dep. 72:13-73:4, 202:3-15 |
| 74. | Carper admits that he missed his 4th quarter 2013 goal, and claims that he "may have" missed his goals for 1st and 2nd quarter 2014. | Carper Dep. 220:2-24 | Undisputed. |
| 75. | Carper subsequently missed his 3rd quarter 2014 goal as well, and then his 4th quarter goal was reduced to improve his chances of meeting it. | Pop Dec. § 3 | Undisputed. |
| 76. | Carper testified that he does not know one way or another whether his 4th quarter 2014 goal was reduced. | Carper Dep. 221:12-21, 253:9-20 | Undisputed. |
| 77. | Carper had the lowest rating of all AEs for the 2013 mid-year and | Pop Dec. § 2 | Undisputed. |

25

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | year-end performance evaluations. | | |
| 78. | Although the budget reduction would be for 2015, Corsini wanted to give Carper as much advance notice as possible so that he could make plans, so Carper was informed of the decision in August 2014. | Pop Dep. 21:6-14, 22:3-23; Corsini Dep. 36:21-37:15 | Undisputed. |
| 79. | Layoffs in other departments also took place during 2014, as well as the decision not to fill numerous open positions. | Corsini Dep. 24:18-20, 25:10-18; Nash Dep. 64:3-6, 66:2-4 | Disputed. Mr. Carper was the single non-union employee terminated as a reduction in force due to budgetary reasons in 2014. Mr. Corsini testified that he could not recall ever terminating a single account executive from the Sales Department his entire tenure at KTLA due to a reduction in force except for Mr. Carper. Corsini Dep. 27:19-28:8, 66:1-6 |
| 80. | Between terminations, and decisions not to fill open positions, the 2015 budget called for a headcount reduction of full-time equivalent positions often (10). | Corsini Dec. § 5 | Undisputed. |
| 81. | KTLA has not added any AEs following the termination of Carper's employment. | Corsini Dep. 120:13-15 | Undisputed. |
| 82. | After another AE resigned in 2015, that AE was not | Corsini Dep. 120:16-121:9 | Disputed in part. Mr. Harper and |

| | DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|---|
| | | replaced, resulting in a net reduction of two AEs in 2015. | | Ms. Schell were two account executives which both began working in February 2014. Even with the termination of Mr. Carper on December 1, 2014 and another account executive leaving in 2015, there is a zero net reduction of account executives. Corsini Dep. 31:11-16, 122:3-10 |
| | 83. | Corsini also is the General Manager for KSWB in San Diego. | Corsini Dep. 37:23-24 | Undisputed. |
| | 84. | In early 2014 (prior to being informed of the elimination of his position), Carper told Corsini that he would be interested in transferring to San Diego because his daughter and grandchildren lived there. | Carper Dep. 58:12-59:5; Corsini Dep. 44:4-9 | Undisputed. |
| | 85. | In August 2014, upon learning of his impending layoff, Carper reiterated his request for a position in San Diego, and Corsini told him that he would "bless it" if the local San Diego management agreed. | Carper Dep. 103:15-106:1; Corsini Dep. 37:16-38:3 | Undisputed. |
| | 86. | A meeting was arranged for KSWB management to meet Carper. | Corsini Dep. 49:14-21; Nash Dep. 117:11-22 | Undisputed. |
| | 87. | Corsini was hopeful that Carper could be successful in San Diego because his sales skills | Corsini Dep. 40:9-23 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | were more conducive to a smaller market. | | |
| 88. | In November 2014, Carper was given an offer to work as an AE at KSWB in San Diego beginning in December 2014. | Nash Dep. 138:16-139:1, Ex. 35 | Undisputed. |
| 89. | The offer included moving expenses. | Nash Dep. 138:16-139:1, Ex. 35 | Undisputed. |
| 90. | The AEs at KSWB have a different compensation structure than the KTLA AEs. The KTLA AEs are paid a sizeable salary, and also are paid commissions based upon how well they have met their sales goals. At KSWB, AEs are given a small draw of approximately $45,000 (which is offset by commissions), and their compensation is primarily commission-based. KSWB AEs earn commissions at a much higher percentage than the AEs at KTLA. | Corsini Dep. 53:5-14, 106:17-107:1; Corsini Dec. § 6 | Undisputed. |
| 91. | During 2015, three out of the eight San Diego AEs made over $200,000, and four others made over six figures. | Corsini Dec. § 6 | Undisputed. |
| 92. | Carper admits that was no cap on what he could earn in San Diego. | Carper Dep. 109:17-19 | Disputed.  Mr. Carper testified that he did not know. Carper Dep. 108:17-109:2 |
| 93. | Carper turned down the San Diego offer. | Carper Dep. 109:20-22 | Undisputed. |

28

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 94. | In his deposition, Carper testified that during the meeting in early August 2014 when he was informed that his position would be eliminated at the end of the year, Barbara Lopez-Nash said "we thought you wanted to retire, and if you want to retire, Don Corsini wants to throw you a retirement party." | Carper Dep. 175:23-176:11 | Undisputed. |
| 95. | Barbara neither made the decision to layoff an account executive nor did she select Carper for the layoff. | Pop Dep. 21:6-25, 23:14-24, 29:24-30:1; Nash Dep. 66:11-19,137:10-15 | Undisputed. |
| 96. | Barbara learned of the decisions only after they had been made and furthermore, and she never had conversations with either Corsini or Mary about Carper retiring. | Nash Dep. 66:11-67:11, 69:7-11, 88:22-89:4, 137:10-15 | Disputed. Ms. Poulipolous' comment was followed by Ms. Lopez-Nash, who stated: "We assumed you wanted to retire, and if you do, Don Corsini wants to throw your retirement party." Carper Dep. at 63:3-12. |
| 97. | Carper alleges that younger AEs began work at KTLA in early 2014. | Complaint ¶ 11 | Undisputed. |
| 98. | The vacancies (that were filled by Claudia Schell and Mark Halper) occurred in early 2013, the candidates were first interviewed in early 2013, and they accepted employment offers late 2013, when KTLA was finishing what had been a good year. | Pop Dep. 76:4-12; Tang Dep. 55:1016; Corsini Dec. ¶ 3 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 99. | At the time that Claudia Schell and Mark Harper were hired, KTLA did not have budgetary issues. | Pop Dep. 31:22-32:4; Pop Dec. ¶ 6 | Disputed. Mr. Harper and Ms. Schell began working at KTLA in February 2014. Mr. Corsini testified that KTLA allegedly was behind 2.2 million dollars in January 2014, a full month before Mr. Harper and Ms. Schell were ever hired. Corsini Dep. 28:9-17, 31:11-16 |
| 100. | Neither Claudia, not Mark, was an advance replacement for Carper, nor did either have any 2014 performance issues. | Pop Dec. ¶ 6 | Disputed in part. Mr. Harper and Ms. Schell took over several of Mr. Carper's accounts, including Living Spaces which grossed over $1,000,000 per year to Mr. Carper's sales figures. Carper Depo. 72:13-73:4 |
| 101. | Carper admits that he has no information about either Claudia Schell or Mark Harper's performance. | Carper Dep. 201:13-15 | Undisputed. |

**Issue 2:** Plaintiff's first cause of action for age discrimination in violation of the FEHA fails as a matter of law as to Defendants because the undisputed evidence establishes that Plaintiff's employment was terminated for a legitimate, non-discriminatory business reason and was not a pretext for unlawful discrimination.

Defendants incorporate Fact Nos. 1-101.

**Wrongful Termination In Violation Of Public Policy (Second Cause of Action**

**Issue 3:**   Plaintiff's second cause of action for wrongful termination in violation of public policy fails as a matter of law as to Defendants because Plaintiff cannot show a prima facie case of discrimination.

Defendants incorporate Fact Nos. 1-101.

**Issue 4:**  Plaintiff's second cause of action for wrongful termination in violation of public policy fails as a matter of law as to Defendants because the undisputed evidence establishes that Plaintiff's employment was terminated for a legitimate, nondiscriminatory business reason and was not a pretext for unlawful discrimination.

Defendants incorporate Fact Nos. 1-101.

**Claims Against Non-Employer Tribune Media Company**

**Issue 5:**   Each ofP1aintif:fs causes of action against Defendant Tribune Media Company ("Tribune Media") fail as a matter of law because Plaintiff cannot dispute that KTLA, LLC ("KTLA") - not Tribune Media - was his employer because: (1 there is a presumption that a parent corporate entity does not employ the employees of a subsidiary, and Plaintiff has no evidence to rebut the presumption; (2 there is no evidence of an integrated employer relationship between Tribune Media and KTLA; (3 there is no evidence of an agency relationship between Tribune Media and KTLA; and (4 there is no evidence that Tribune Media is an alter ego of KTLA.

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 102. | Donn Carper was employed by KTLA, which is a limited liability company. | Declaration of Michael Butler ("Butler Dec.") ¶ 2 | Undisputed. |
| 103. | KTLA has one member, Tribune Broadcasting Company LLC (which is not a party), which also is a limited liability company. | Butler Dec. ¶ 2 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 104. | Tribune Broadcasting Company LLC has one member, Defendant Tribune Media Company ("Tribune Media"), which is corporation. | Butler Dec. ¶ 2 | Undisputed. |
| 105. | KTLA has its own separate management in the areas of production, news, sales, promotion, traffic, finance, building & office services, and administration, which are responsible for the operating aspects of KTLA's business. | Butler Dec. ¶ 3 | Undisputed. |
| 106. | The heads of each of these departments are KTLA employees, and are not Tribune Media employees. | Butler Dec. ¶ 3 | Undisputed. |
| 107. | Don Corsini is KTLA's President and General Manager. Mr. Corsini is not a member of Tribune's management team, nor does he sit on Tribune Media's Board of Directors. | Butler Dec. ¶ 3 | Undisputed. |
| 108. | Tribune Media does not make decisions regarding the hiring, firing, discipline, performance management, commission structure, eligibility for pay increases, and work assignments relating to the managers, supervisors, and employees of KTLA. | Butler Dec. ¶ 5 | Undisputed. |
| 109. | Plaintiff Donn Carper was hired by KTLA in California and he remained an employee of KTLA until his termination. | Butler Dec. ¶ 4 | Undisputed. |
| 110. | Tribune Media never employed Carper. | Butler Dec. ¶ 4 | Undisputed. |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 111. | KTLA's management made the decision to terminate Carper's employment. | Butler Dec. ¶ 4 | Undisputed. |
| 112. | Tribune Media did not participate in the decision to terminate Carper's employment with KTLA. | Butler Dec. ¶ 4 | Undisputed. |

**Claim For Punitive Damages**

**Issue 6:** Plaintiff's claim for punitive damages fails as a matter of law as to Defendants because Plaintiff cannot demonstrate with clear and convincing evidence that any officer, director, or managing agent engaged in malice, oppression or fraud.

Defendants incorporate Fact Nos. 1-101.

**Issue 7:** Plaintiff's claim for punitive damages fails as to Tribune Media because Plaintiff cannot demonstrate with clear and convincing evidence that an officer, director, or managing agent of Tribune Media made any decision regarding his employment.

Defendants incorporate Fact Nos. 102-112.

**After Acquired Evidence Affirmative Defense**

**Issue 8:** Defendants are entitled to summary judgment on their affirmative defense of after-acquired evidence because they have shown as a matter of law that had Plaintiff remained employed, he would have been terminated on March 6, 2015 when evidence of his malfeasance was discovered.

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| 113. | On March 6, 2016 (after Carper's departure from KTLA) it came to management's attention that Carper failed to | Pop Dep. 124:5-17; Pop Dec. § 4; Tang Dep. 97:5-10 | Disputed. In October 2014, Mr. Carper exchanged e-mails with individuals |

33

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | ensure that a cancellation, which was timely requested by the Kevin's Jewelers account, was processed. | | handling KTLA's Kevin Jeweler's account, in which Mr. Carper agreed to change Kevin Jeweler's advertisements scheduled to run in November and December to a cheaper time slot. (Exhibit 9 and Carper Depo. at 204:12-205:20) Kevin Jewelers confirmed in March 2015 that the changes Mr. Carper agreed to for the November advertisements were properly changed.  (Exhibit 10 and Tang Depo. at 92:24-93:22). Mr. Carper testified he did not remember if he made these changes for December 2014 advertisements run, but further testified "But I confirmed it.  So I would think that would have been done." (Exhibit 10 and Tang Depo. at 92:24-93:22). Ms. Tang testified that Mr. Carper gave an update on each of his accounts before he left KTLA in 2014, but that she could not recall if Mr. Carper ever gave Ms. Tang an update on the Kevin Jewelers account. (Tang |

34

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | Depo. at 96:17-97:4) |
| 114. | The Kevin's Jewelers account was assigned to Carper throughout 2014, and was not reassigned to another AE until January 2015. | Tang Dep. 86:21-87:8 | Disputed. In October 2014, Mr. Carper exchanged e-mails with individuals handling KTLA's Kevin Jeweler's account, in which Mr. Carper agreed to change Kevin Jeweler's advertisements scheduled to run in November and December to a cheaper time slot. (Exhibit 9 and Carper Depo. at 204:12-205:20) Kevin Jewelers confirmed in March 2015 that the changes Mr. Carper agreed to for the November advertisements were properly changed. (Exhibit 10 and Tang Depo. at 92:24-93:22). Mr. Carper testified he did not remember if he made these changes for December 2014 advertisements run, but further testified "But I confirmed it. So I would think that would have been |

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | done." (Exhibit 10 and Tang Depo. at 92:24-93:22). Ms. Tang testified that Mr. Carper gave an update on each of his accounts before he left KTLA in 2014, but that she could not recall if Mr. Carper ever gave Ms. Tang an update on the Kevin Jewelers account. (Tang Depo. at 96:17-97:4) |
| 115. | An email that Mary Pouliopoulos felt was argumentative, inaccurate, and not I customer service oriented was sent by Carper to the client as to why changes to the order could not be made. | Pop Dep. 124:18-125:15, 127:12-16; Pop Dec. § 5, Ex. 1; Tang Dep. 90:14-92:12 | Undisputed. |
| 116. | Carper admits that a client is permitted to cancel with two weeks' notice. | Carper Dep. 177:18-24 | Undisputed. |
| 117. | Carper admits that he does not recall whether he cancelled the order. | Carper Dep. 203:24-205:17, Ex. 34 | Undisputed. |
| 118. | Failure to cancel the Kevin's Jeweler's order pursuant to the client's request resulted in a billing error of $22,000. | Pop Dec. § 4 | Disputed. In October 2014, Mr. Carper exchanged e-mails with individuals handling KTLA's Kevin Jeweler's account, in which Mr. Carper agreed to change Kevin Jeweler's advertisements scheduled to run in November and December to a cheaper time slot. (Exhibit 9 and Carper Depo. at |

36

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | | | 204:12-205:20) Kevin Jewelers confirmed in March 2015 that the changes Mr. Carper agreed to for the November advertisements were properly changed. (Exhibit 10 and Tang Depo. at 92:24-93:22). Mr. Carper testified he did not remember if he made these changes for December 2014 advertisements run, but further testified "But I confirmed it. So I would think that would have been done." (Exhibit 10 and Tang Depo. at 92:24-93:22). Ms. Tang testified that Mr. Carper gave an update on each of his accounts before he left KTLA in 2014, but that she could not recall if Mr. Carper ever gave Ms. Tang an update on the Kevin Jewelers account. (Tang Depo. at 96:17-97:4) |
| 119. | KTLA was able to recover some of the money by running additional ads for the client, but ultimately KTLA had to issue the client a $11,900 credit. | Pop Dep. 125:6-11; Tang Dep. 92:13-18 | Undisputed. |
| 120. | Carper had already been paid a commission on the | Pop Dep. 125:6-12; Pop Dec. § 5 | Undisputed. |

37

| DEFS.' SUF No. | FACT | SUPPORTING EVIDENCE | PL.'S RESPONSE |
|---|---|---|---|
| | original order. | | |
| 121. | Had Carper still been employed when the failure to cancel was discovered, he would have been terminated when Mary saw his argumentative email to the client and discovered that the order was not cancelled. | Pop Dec. § 5, Ex. 1; Corsini Dec. § 7 | Disputed.  Prior to budgetary concerns in 2014, despite Mr. Carper's performance issues, including alleged argumentative e-mails, long e-mails, and poor client service, Ms. Pouliopoulos, Ms. Tang, Mr. Duarte, and Ms. Ganier have never once recommended Mr. Carper for termination due to performance deficiencies. (Pouliopoulos Depo. at 25:3-7; Tang Depo. at 49:16-25; Duarte Depo. at 90:24-91:2; and Ganier Depo. at 74:23-25). |

///
///
///
///
///
///

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED FACTS AND CONCLUSIONS OF LAW

# PLAINTIFF'S SEPARATE STATEMENT OF

# UNDISPUTED MATERIAL FACTS

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 1. | Mr. Carper began his career selling TV advertisements as an account executive since 1968. | (Exhibit 1). |
| 2. | Mr. Carper had over 40 years of experience in selling TV advertisements before being hired at KTLA in 2009. | (Exhibit 1). |
| 3. | Mr. Carper's experience in the industry prior to joining KTLA also included executive and management positions at ABC, UNIVISION, DDLA Inc., UVC, and KSLA Media. | (Exhibit 1). |
| 4. | Mr. Carper met Mr. Corsini and Mr. Kincaid while the three worked together at ABC between 1974 and 1986. | (Carper Depo. at 22:10-23:4). |
| 5. | Mr. Carper also worked with Mr. Corsini and Mr. Kincaid at KCBS. | (Carper Depo. at 22:10-19). |
| 6. | In September 2008, Mr. Carper's position of Vice-President of New Business Development and Marketing was eliminated from KCBS. | (Carper Depo. at 15:4-16:1). |
| 7. | In 2009, Mr. Corsini and Mr. Kincaid left KCBS and joined KTLA. | (Corsini Depo. at 15:18-21 and Declaration of Mike Kincaid "Kincaid Decl." ¶2). |
| 8. | At the time that Mr. Carper was hired at KTLA, Mr. Corsini was the President and Mr. Kincaid was the Senior Vice President of Sales. | (Corsini Depo. at 15:18-21and Kincaid Decl. ¶1). |
| 9. | Mr. Kincaid declares under oath (Mr. Kincaid's declaration was provided to Defendant over a month ago in March 2016 and Mr. Kincaid has yet to be subpoenaed for deposition.) that he pursued hiring Mr. Carper because of his prior decades of excellent performance: I pursued the decision to hire Mr. Carper after I joined | (Kincaid Decl. ¶2). |

39

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | KTLA in 2009 because I believed he was an excellent performer as an account executive. | |
| 10. | Mr. Kincaid also declares that he was principally responsible for hiring Mr. Carper, but that he needed Mr. Corsini's approval. | (Kincaid Decl. ¶3). |
| 11. | Mr. Corsini never provided any disagreement to Mr. Kincaid over the decision to hire Mr. Carper other than raising a minor personal issue which was resolved. | (Kincaid Decl. ¶3). |
| 12. | Mr. Kincaid also declared that he also informed Ms. Tang that Mr. Carper would be hired and Ms. Tang never provided any disagreement. | (Kincaid Decl. ¶3). |
| 13. | As an account executive in the Sales Department, Mr. Carper reported directly to Local Sales Managers ("LSM"). | (Poulipolous Depo. at 15:9-17). |
| 14. | LSM's during Mr. Carper's employment included Troy Arce Ganier, Patti Tang, Nancy Caldwell, and Jozef Duarte.. | (Carper Depo. at 48:21-49:1 and Poulipolous 16:4-14) |
| 15. | From the start of Mr. Carper's employment in 2009 to February 2013, LSM's reported to the General Manager of the Sales Department, Mary Poulipolous, who in turn reported to Mike Kincaid, Senior Vice President of Sales. | (Poulipolous Depo. at 15:9-17, 18:8-13, 57:4-5). |
| 16. | Mr. Kincaid reported directly to Mr. Corsini. | (Kincaid Decl. ¶1). |
| 17. | Mr. Kincaid retired from KTLA in February 2013. | (Kincaid Decl. ¶1). |
| 18. | Following Mr. Kincaid's retirement, Ms. Poulipolous became General Manager/Vice President of the Sales Department, and Ms. Poulipolous reported directly to Mr. Corsini. | (Poulipolous Depo. at 16:10-21). |
| 19. | Mr. Corsini, Ms. Poulipolous, Ms. | (Corsini Depo. at 15:18-24; |

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Tang, Ms. Ganier, and Mr. Duarte each still remain employed by KTLA. | Poulipolous Depo. at 16:4-21; Tang Depo. at 14:13-24; Ganier Depo. at 16:16-18; and Duarte Depo. at 14:17-24). |
| 20. | Mr. Kincaid, a former high ranking manager at KTLA, declared that Mr. Carper was an excellent account executive:<br>Mr. Carper strived for the best client satisfaction, positive relationships with clients and internally with his sales team, timely in all respects, always prepared, and did whatever was necessary to excel as an account executive. | (Kincaid Decl. ¶2). |
| 21. | Mr. Kincaid further declared that during his employment as Vice President of the Sales Department, he only recalls hearing one isolated incident regarding Mr. Carper's long e-mails which he reviewed and believed to be "blown out of proportion." | (Kincaid Decl. ¶4). |
| 22. | During Mr. Carper's employment at KTLA, Mr. Carper was an account executive for David Ross, owner of Ross Advertising Inc., Candace Ross, senior negotiator of Callan Advertising, and Kristen Werner, former Senior Media Buyer at Far West Media. | (David Ross Depo. at 6:4-8, 9:6-8; Candace Ross 7:7-8, 8:11-19, 11:20-12:6, Kristen Werner Depo. at 8:17-22, 10:13-22). |
| 23. | Mr. Ross testified as follows: 1) Mr. Carper was "[o]ne of the best [account executives] I've ever had" | (David Ross Depo. at 12:18-22); |
| 24. | 2) Mr. Carper was "one of a small handful of the best that's ever called on me" | (David Ross Depo. at 12:18-22); |
| 25. | 3) "With Mr. Carper, no detail ever fell through the cracks . . . . [which] is expected of station account executives" | (David Ross Depo. at 13:9-15); |
| 26. | and 4) Mr. Ross never made a negative phone call to Ms. Tang about Mr. Carper's performance | (David Ross Depo. at 13:22-25). |

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 27. | Mr. Ross further testified:<br>    [T]he KTLA Television or any other television station or radio station in America that I deal with where it is highly negotiable, it is a high stress business, where I could get on the telephone and be yelling, as an example, at Mr. Carper about "your television station," and I do it for effect.  Never anything personal, never his being negligent of duty." | (David Ross Depo. at 14:19-25). |
| 28. | Ms. Ross testified as follows: 1) Ms. Ross was "very satisfied" with Mr. Carper's performance on her account | (Candace Ross Depo. at 15:3-7); |
| 29. | 2) Mr. Carper would always make himself readily available to Ms. Ross | (Candace Ross Depo. at 21:10-23); |
| 30. | and 3) Ms. Ross did not recall ever having any complaints about Mr. Carper not responding to her needs in a timely fashion despite admitting that Ms. Ross herself is "a very impatient person." | (Candace Ross Depo. at 22:18-23, 23:1-4). |
| 31. | Ms. Werner testified as follows: 1) Ms. Werner believed Mr. Carper "was a very good rep" and was "shocked to hear he had been let go" | (Kristen Werner Depo. at 26:7-10); |
| 32. | 2) Mr. Carper knew what Far West Media was "looking for" | (Kristen Werner  Depo. at 20:6-18); |
| 33. | 3) Mr. Carper was always courteous to Ms. Werner | (Kristen Werner  Depo. at 22:13-15; |
| 34. | 4) Ms. Werner never complained about Mr. Carper | (Kristen Werner Depo. at 22:19-23:2); |
| 35. | 5) Ms. Werner received long e-mails from Mr. Carper which she deemed a "good e-mail" | (Kristen Werner Depo. at 22:19-23:2); |
| 36. | and 6) Mr. Carper would always respond to Ms. Werner in a timely fashion. | (Kristen Werner Depo. at 24:21-25:11). |
| 37. | In August 2014, Mr. Carper was unexpectedly called into a meeting with Ms. Poulipolous and Barbara | (Carper Depo. at 59:24-60:6). |

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Lopez-Nash. | |
| 38. | Ms. Nash is KTLA's former Regional Human Resources Director. | (Nash Depo. at 9:2-10:5). |
| 39. | Mr. Carper testified that at this meeting, Ms. Poulipolous informed Mr. Carper that KTLA would be eliminating Mr. Carper's sales position. | (Carper Depo. at 59:24-60:1). |
| 40. | Mr. Carper was told his job position would be eliminated effective December 2014. | (Carper Depo. at 62:18-24). |
| 41. | Ms. Poulipolous' comment was followed by Ms. Lopez-Nash, who stated: "We assumed you wanted to retire, and if you do, Don Corsini wants to throw your retirement party." | (Carper Depo. at 63:3-12). |
| 42. | In at least one e-mail, Mr. Corsini, mentions that he is willing to throw Mr. Carper a "no-host retirement" party. | (Exhibit 2 and Corsini Depo. at 86:21-88:3). |
| 43. | Mr. Carper responded "What gave you the idea that I wanted to retire? It's not on my radar." | (Carper Depo. at 63:3-14). |
| 44. | Mr. Carper was shocked and surprised, further inquiring whether he was being fired for performance. | (Carper Depo. at 64:12-19). |
| 45. | Ms. Poulipolous assured Mr. Carper that he was not being fired for performance but that his job was being eliminated. | (Carper Depo. at 64:12-19). |
| 46. | Mr. Corsini and Ms. Poulipolious testified that they collaboratively made decision to choose Mr. Carper to be laid off. | (Corsini Depo. at 31:6-10, 32:8-22; Poulipolious Depo. at 19:17-20). |
| 47. | Ms. Poulipolious testified that as part of the discussion for selecting an account executive to be laid off, no other account executive was ever even considered for Defendant's RIF due to budgetary reasons. | (Poulipolious Depo. at 22:1-9, 26:1-6). |
| 48. | At the time of Mr. Carper's layoff in | (Carper Depo. at 27:23-24, |

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | December 2014, Mr. Carper was 69 years old, the oldest account executive in the Sales Department at KTLA. | 62:18-24 and Exhibit 3). |
| 49. | In 2014, KTLA employed 556 full time and part times employees. (Exhibit 4). | |
| 50. | Throughout Mr. Corsini's entire duration of being employed at KTLA, Mr. Corsini does not recall ever eliminating an account executive from the Sales Department due to budgetary reasons. | (Corsini Depo. at 66:1-6). |
| 51. | Mr. Corsini, Ms. Poulipolous, Ms. Tang, Ms. Ganier, and Mr. Duarte each testified that KTLA had budgetary issues in 2014 and budgetary issues were all done verbally in weekly "managers meetings." | (Corsini Depo. at 28:9-21, 29:4-21; Poulipolous Depo. at 32:5-18; Tang 36:17-21; Ganier 76:16-24). |
| 52. | Mike Weiner, KTLA's former Chief Financial Officer, testified that cost cutting measures were instituted due to budgetary reasons in 2014 which included reducing overtime hours, reducing food and beverage expenses, and reducing repair expenses. | (Weiner Depo. at 43:23-44:8). |
| 53. | Mr. Weiner likewise testified that all conversations about cost cutting measures were all done verbally at weekly "managers meetings." | (Weiner Depo. at 44:9-46:6). |
| 54. | Mr. Corsini, Ms. Poulipolous, Ms. Tang, Ms. Ganier, Mr. Duarte, and Mr. Weiner each testified that they do not possess nor have ever seen a single e-mail, memorandum, or meeting minutes relating to budgetary issues at KTLA in 2014. | (Corsini Depo. at 29:4-21; Poulipolous Depo. at 91:4-12; Tang 36:22-25; Ganier 75:24-76:7, 76:16-24; Duarte 96:1-16; and Weiner Depo. at 44:9-46:6). |
| 55. | All communications by these individuals relating to budgetary issues at KTLA in 2014 were all done verbally without any type of | (Corsini Depo. at 29:4-24, Tang 36:22-25; and Duarte 96:1-16). |

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | written e-mails, memorandums, or meeting minutes from the weekly "managers meetings." | |
| 56. | Despite Mr. Corsini's claim that KTLA was behind in sales $2.2 million by January 2014, Mark Harper and Claudia Schell began working at KTLA as account executives in the Sales Department in February 1, 2014. | (Corsini Depo. at 28:9-21 and Ganier Depo. at 73:1-9). |
| 57. | Mr. Carper maintained a $126,000 base salary while employed at KTLA, whereas Mr. Harper and Ms. Schell were each given a higher base salary of $140,000 per year with the potential for additional compensation based on commission. | (Carper Depo. at 189:6-7 and Ganier Depo. at 166:6-168:5). |
| 58. | At the time Mr. Harper and Ms. Schell began working at KTLA in February 2014, Ms. Schell was 38 years old and Mr. Harper was 41 years old. | (Exhibit 3). |
| 59. | After Mr. Harper and Ms. Schell were hired, several of Mr. Carper's accounts were taken from his account list and given to Mr. Harper and Ms. Schell. | (Exhibit 3). |
| 60. | Moreover, upon being laid off in December 2014, additional accounts that belonged to Mr. Carper were given to Mr. Harper (38 years old) and Ms. Schell (41 years old). | (Exhibit 3 And Poulipolous Depo. at 126:14-19). |
| 61. | Specifically, Mr. Carper was required to transfer his Living Spaces account, worth over $1 million dollars annually in sales. | (Carper Depo. at 72:10-73:1). |
| 62. | Ms. Poulipolous testified that no other employee in the Sales Department (including Mr. Harper and Ms. Schell) were ever considered as part of the layoff. | (Poulipolous Depo. at 26:1-6). |
| 63. | Ms. Lopez-Nash testified that Mr. Carper was the single non-union employee chosen for a layoff, a one | (Nash Depo. at 65:24-67:8). |

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | person Reduction-In-Force ("RIF") due to budgetary reasons at KTLA. | |
| 64. | Ms. Lopez-Nash further testified that no other non-union employees were RIF'd during KTLA's striking down year in 2014. | (Nash Depo. at 65:24-67:8). |
| 65. | Ms. Ganier testified that during her ten (10) years of being employed at KTLA, she was not aware of a *single* other employee being subject to a RIF due to budgetary concerns. | (Ganier Depo. at 169:14-25). |
| 66. | Mr. Corsini testified that throughout his duration of being President, he could not recall ever laying of a single account executive from the Sales Department due to budgetary concerns. | (Corsini Depo. at 66:1-6). |
| 67. | After being notified of his layoff in August 2014, Mr. Carper met with Mr. Corsini and John Moczulski, KTLA's Station Manager. | (Carper Depo. at 102:10-103:23). |
| 68. | Mr. Carper complained that KTLA was "dump[ing] the old guy." | (Nash Depo. at 161:8-162:16 and Exhibit 5). |
| 69. | Mr. Carper requested instead of being eliminated, if he could instead transfer to KTLA's sister station, KSWB, in San Diego. | (Carper Depo. at 104:8-16). |
| 70. | Mr. Corsini "blessed" the idea and Ms. Lopez-Nash set up a meeting between Mr. Carper and KSWB's Station Manager, Scott Heath, and KSWB's General Manager, Kelly McMackin. | (Carper Depo. at 105:4-11 and Nash Depo. at 119:2-17). |
| 71. | Although KTLA claims Mr. Carper had performance issues from the time he was hired at KTLA, Mr. Corsini, Ms. Poulipolous, Ms. Ganier, Ms. Tang, Mr. Duarte, nor Ms. Lopez-Nash ever once voiced disagreement or concern with Mr. Carper transferring to KSWB. | (Corsini Depo. at 46:5-8, 40:12-18; Poulipolous Depo. at 99:21-24; Ganier Depo. at 109:11-13; Tang Depo. at 85:14-17, Duarte Depo. at 98:3-15; and Nash Depo. at 120:2-10). |
| 72. | In fact, Ms. Lopez-Nash believed Mr. Carper transferring to KSWB was a "great idea" despite alleged | (Nash Depo. at 120:2-10). |

46

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
|  | performance deficiencies. |  |
| 73. | Post-litigation, Mr. Corsini appears to now claim that his recommendation to Mr. Carper to KSWB was due to the different market structures, testifying: "The dynamics in San Diego are such where it's more one-on-one, shake hands, be close to your clients." | (Corsini Depo. at 40:9-18). |
| 74. | Nevertheless, when questioned at deposition how a different market could change KTLA's claimed performance issues such as getting along with management, Mr. Carper having lengthy e-mails, or Mr. Carper going around his direct managers to higher management, Mr. Corsini had no explanation but simply concludes: "I don't believe that would have happened in San Diego." | (Corsini Depo. at 40:24-41:6). |
| 75. | Mr. Carper did well in his meetings with Mr. McMackin and Mr. McMackin and was given an offer as an account executive at KSWB earning a $45,000 salary plus commission, compared to Mr. Carper's $126,000 salary plus commission while employed at KTLA. | (Carper Depo. at 107:5-109:12). |
| 76. | Mr. Carper believed compensation offered by KSWB was entry level and not sufficient for his skills and experience, thus declining the offer. | (Carper Depo. at 109:20-110:2). |
| 77. | In September 2012, Mr. Carper received a written warning from Ms. Pouliopoulos which Mr. Carper signed and acknowledged receipt. | (Exhibit 6). |
| 78. | Mr. Carper disagreed with the written warning and in October 2012, Mr. Carper responded to the written warning in writing. | (Exhibit 7). |
| 79. | No employee at KTLA ever discussed Mr. Carper's response to this written warning. | (Pouliopoulos Depo. at 63:20-65:6). |

47

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 80. | KTLA simply put Mr. Carper's response in his employee file and never revisited this issue. | (Nash Depo. at 43:7-17). |
| 81. | In November 2013, Mr. Duarte, Ms. Pouliopoulos, and Ms. Lopez-Nash collaboratively created a "Last and Final Written Warning." | (Exhibit 8 Nash Depo. at 47:8-11, 57:15-58:21). |
| 82. | Mr. Carper's signature is nowhere to be found on this document. | (Nash Depo. at 47:12-48:7). |
| 83. | Shockingly, this "Last and Final Written Warning" was not seen by Mr. Carper until he requested his personnel file following his layoff from KTLA. | (Carper Depo. at 66:10-16). |
| 84. | Mr. Duarte testifies that he never gave the Last and Final Written Warning to Mr. Carper. | (Duarte Depo. at 58:22-59:5). |
| 85. | Ms. Lopez-Nash testified she never gave the Last and Final Written Warning to Mr. Carper. | (Nash Depo. at 48:5-7). |
| 86. | Ms. Poulipolous does not recall ever seeing Mr. Carper's Last and Final Written Warning. | |
| 87. | Ms. Lopez-Nash testified that during her 17 years of employment at KTLA, she could not recall a single other instance where a Last and Final Written Warning was placed in a non-union employee's file that the employee did not receive. | (Nash Depo. at 53:16-24). |
| 88. | Mr. Kincaid declares: I understand that Mr. Carper was issued a last and final written warning, but it was never presented to him or given to him for his signature. As the Vice President of Sales, I was familiar with KTLA's policies and procedures as they relate to the disciplining of employees, particularly so in the Sales Department. I believe it would be against KTLA's policies and procedures to issue a document | (Kincaid Decl. ¶5). |

| PL.S' SUF No. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | as crucial as a final warning without ever giving it to an employee for his or her signature. | |
| 89. | In October 2014, Mr. Carper exchanged e-mails with individuals handling KTLA's Kevin Jeweler's account, in which Mr. Carper agreed to change Kevin Jeweler's advertisements scheduled to run in November and December to a cheaper time slot. | (Exhibit 9 and Carper Depo. at 204:12-205:20) |
| 90. | Ms. Tang was the LSM on the Kevin Jewelers account. | (Carper Depo. at 52:23-53:10). |
| 91. | Kevin Jewelers confirmed in March 2015 that the changes Mr. Carper agreed to for the November advertisements were properly changed. | (Exhibit 10 and Tang Depo. at 92:24-93:22). |
| 92. | Mr. Carper testified he did not remember if he made these changes for December 2014 advertisements run, but further testified "But I confirmed it.  So I would think that would have been done." | (Carper Depo. at 205:15-20). |
| 93. | Ms. Tang testified that Mr. Carper gave an update on each of his accounts before he left KTLA in 2014, but that she could not recall if Mr. Carper ever gave Ms. Tang an update on the Kevin Jewelers account. . | (Tang Depo. at 96:17-97:4) |
| 94. | Prior to budgetary concerns in 2014, despite Mr. Carper's performance issues, including alleged argumentative e-mails, long e-mails, and poor client service, Ms. Pouliopoulos, Ms. Tang, Mr. Duarte, and Ms. Ganier have never once recommended Mr. Carper for termination due to performance deficiencies. | (Pouliopoulos Depo. at 25:3-7; Tang Depo. at 49:16-25; Duarte Depo. at 90:24-91:2; and Ganier Depo. at 74:23-25). |

///

49

**CONCLUSIONS OF LAW**

**A.     The Statutory Age Discrimination Claim Fails Because Plaintiff Can Show Neither A Prima Facie Case of Age Discrimination, Nor That The Legitimate, Non-Discriminatory Reason For His Termination Was Pretext (Issues 1 and 2)**

1.     The Fair Employment and Housing Act ("FEHN') resolves discrimination claims by applying a burden-shifting procedure known as the McDonnell Douglas test. *See McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802-05 (1973); *Guz* v. *Bechtel Nat'l, Inc.,* 24 Cal. 4th 317,354 (2000). Under this test, Plaintiff bears the burden of proof by showing that: (1) he was in a protected group; (2) he was performing competently in his job; (3) he suffered an adverse employment action; and (4) there are circumstances suggesting a discriminatory motive. *McDonnell Douglas,* 411 U.S. at 802; *Guz,24* Cal. 4th at 355. When a position is eliminated and the plaintiff was not replace, he "must show through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Nesbit v. Pepsico, Inc.,* 994 F.2d 703,705 (9th Cir. 1993).

2.     If Plaintiff meets his burden of establishing a *prima facie* case, Defendants must then articulate a legitimate, nondiscriminatory reason for the discharge. Once they have done so, any presumption of discrimination raised by the *prima facie* case disappears. Plaintiff then must prove that the Defendants' explanation is a pretext to cover-up a discriminatory motive. *Id.* at 754-55; *McDonnell Douglas,* 411 U.S. at 807; *Guz;* 24 Cal. 4th at 354-58.

3.     To meet this burden, Plaintiff must do more than "simply show that the employer's decision was wrong, mistaken, or unwise." *Horn v. Cushman* & *Wakefield, Inc.,* 72 Cal. App. 4th 798,807 (1999). Rather, he must show, through substantial responsive evidence, that intentional and unlawful discrimination was the true reason for the decision. *See Chuang v. Univ. of California Davis, Bd. of Trustees,*

225 F.3d 1115,  1127 (9th Cir. 2000) (plaintiff must prove pretext); *Arteaga v. Brinks, Inc.,* 163 Cal. App.4th 327,344 (2008) (summary judgment affirmed: "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is ... whether the given reason was a pretext. ..." "The employer's stated legitimate reason ... does not have to be a reason that the judge or jurors would act on or approve."); *Martin v. Lockheed Missiles & Space Co.,* 29 Cal. App. 4th 1718, 1735 (1994) (plaintiff must produce "substantial responsive evidence" that the employer's showing was untrue or pretextua1, and plaintiffs own speculation as to the true reasons for his selection for layoff does not rise to the level of substantial responsive evidence). *See also Coleman  v. Quaker Oats Co.,* 232 F.3d 1271, 1282 (9th Cir. 2000) ("A RIF is a legitimate nondiscriminatory reason for laying off an employee."); *Sorosky v. Burroughs Corp., 826* F.2d 794, 803-4 (9th Cir. 1987) (reorganization constituted a legitimate, nondiscriminatory reason for termination); *McFarland v. Sears Holdings Mgmt., 2013* WL 1333720, *9-10 (N.D. Cal. Mar. 29, 2013) motion for relief from judgment denied, 2013 WL 2450113 (N.D. Cal. June 5, 2013) ("courts have held that a layoff pursuant to a RIF can be a sufficient legitimate reason for a defendant to prevail in disposing of a discrimination claim"); *Holtzclaw v. Certainteed Corp.,* 795 F. Supp. 3d 996, 1012 (E.D. Cal. 2011) (holding that the employer had established a legitimate, non-discriminatory reason for discharge where the employer had "made the decision to terminate Plaintiffs employment because the economy had negatively impacted the [business]"). *Malmstrom v. Kaiser Aluminum & Chemical Corp.,* 187 Cal. App. 3d 299,321 (1986) ("[Employer] presented undisputed evidence of the depressed condition of its ...business and its business decision to reduce its staff with the result that [plaintiff s] services were no longer needed.").

4.    California federal and state courts alike uniformly hold that budgetary cuts and workforce reductions constitute legitimate non-discriminatory reasons for termination decisions. *See Schechner v. KPIX-TV,* 686 F.3d 1018, 1025 (9th Cir.

1   2012) (holding that layoffs for cost reduction was a legitimate, non-discriminatory

2   reason for discharge); *Martin v. Lockheed Missiles,* 29 Cal. App. 4th 1718, 1732

3   (1994) ("'[T]he depressed condition of [the employer's]. .. business and its business

4   decision to reduce its staff with the result that [the employee's] services [are] no

5   longer needed' can be good cause for discharging the employee [... ] and can also

6   support an inference of good faith, and the absence of an improper motive, in the

7   discharge decision.").

8      5.    An employer may select the employee who was perceived by his

9   supervisors to be the poorest performer. *Aragon v. Republic Silver State Disposal*

10  *Inc.,* 292 F.3d 654, 660-62,664 (9th Cir. 2002) (affirming summary judgment in age

11  discrimination case where plaintiff failed to demonstrate that employer's legitimate

12  business reason for plaintiffs selection for layoff -- economic downturn and plaintiffs

13  poor performance - - was a pretext for discrimination); *Holtzclaw,* 795 F. Supp. 2d

14  at 1013-14 (affirming summary judgment in age discrimination action where

15  employer stated legitimate business reason for plaintiff's selection for layoff -

16  economic downturn - and plaintiff "continued to perform job duties in a less that

17  satisfactory manner"). For a sales person, court, client dissatisfaction with the service

18  provided constitutes a legitimate non-discriminatory reason as a matter of law. See

19  *Black v. Baxter Healthcare Corp.*, 129 F.3d 124, at *1-*3 (9th Cir. 1997) (summary

20  judgment affirmed in discrimination case where plaintiff was terminated for poor

21  performance, including customer requests that plaintiff be removed from their

22  accounts); *Drumm v. Morningstar*, Inc., 2009 WL 2612311, at *3 (N.D. Cal., Aug.

23  24,2009) (summary judgment affirmed in discrimination case where plaintiff was

24  terminated from sales director position for legitimate business reason that two clients

25  requested plaintiff's removal from account).

26     6.    "[I]solated and 'stray' remarks are insufficient to establish discrimination

27  without other indicia of discriminatory intent." *Merrick v. Farmers Ins. Group*, 892

28  F.2d 1434,1438 (9th Cir. 1990) (internal quotations omitted). "Indeed, 'remarks ...

when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision-maker in issue." *Holtzclaw,* 795 F. Supp. 2d at 1014 (stray remarks about plaintiff's age did not establish pretext where they were unrelated to the decisional process; human resources manager told plaintiff he should "think about retiring," that plaintiff "could [retire and] take his wife out," and "that [plaintiff] had turned fifty five (55) while on medical leave and that he was 'old enough to retire'") (quoting *Smith* v. *Firestone Tire & Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir. 1989); *Selby v. Pepsico, Inc.,* 784 F. Supp. 750,758 (N.D. Cal. 1991) aff'd sub nom. *Nesbit v. Pepsico, Inc.,* 994 F.2d 703 (9th Cir. 1993) (manager's statements to plaintiff that "Pepsi didn't necessarily like grey hair" was a "stray remark" that did not create a triable issue of fact of discriminatory intent because plaintiff failed to show that manager participated in the termination decision).

7.      An employer is not required to choose the most junior employees when eliminating a position. "The laws against age discrimination do not 'require[ ] that younger employees be fired so that employees in the protected age group can be hired.'" *Guz,* 24 Cal. 4th at 375 (internal quotations omitted); *see Rose* v. *Wells Fargo & Co., 902* F.2d 1417, 1424-26 (9th Cir. 1990) (affirming summary judgment on age discrimination claim where "managers were instructed to consider an employee's performance and longevity, [though] the process of job elimination and restaffing was otherwise discretionary and subjective" and less senior employees were not selected for layoff). "[T]he decision to discharge a qualified, older employee is not inherently suspicious.... In a [reduction in force], qualified employees are going to be discharged." *Id.* at 375 (internal quotations omitted). Furthermore, the hiring of new employees before a reduction in force is not evidence of pretext. *See Speck* v. *Pacific Cycle, Inc.,* 2009 WL 242536, at *7 (Cal. Ct. App., Feb. 3,2009) (plaintiff failed to create a triable issue as to whether there was a legitimate business reason for his termination – a reduction in force – where plaintiff argued that the employer hired

1   two new employees into newly created positions in the months before plaintiffs

2   termination).

3       8.      Plaintiff cannot show a *prima facie* case of age discrimination because

4   there is no circumstantial, statistical, or direct evidence that his discharge occurred

5   under circumstances giving rise to an inference of age discrimination. Plaintiff cannot

6   dispute the fact that 2014 was a poor year for KTLA and that budget reductions, both

7   for the Station as a whole and for the sales department in particular, were made for

8   2015. Nor can he deny that prior to the budget reductions, his performance was

9   unsatisfactory in multiple respects. He had missed his sales goals for three quarters,

10  he was not complying with his managers' directives, and he was alienating advertisers

11  to the point that some of them were demanding his removal from their accounts.

12      9.      Alternatively, Defendants have offered a legitimate, non-discriminatory

13  reason for Plaintiffs termination; KTLA eliminated an account executive position due

14  to economic conditions, and Plaintiff was selected for layoff because Management

15  believed him to be the poorest performer of all the account executives. He cannot

16  show through substantial responsive evidence, that intentional and unlawful

17  discrimination was the true reason for his discharge.

18  **B.    Plaintiff's Duplicative Public Policy Claim Fails For The Same**

19  **Reasons (Issues 3 and 4)**

20      10.     Plaintiff's public policy claim is based on the same allegations as his

21  discrimination claim. Because it is entirely derivative and duplicative of his

22  discrimination claim, it rises fails for the same reasons. *Shoemaker* v. *Myers,* 52 Cal.

23  3d 1,24 (1990) (wrongful termination claim dismissed because it merely duplicated

24  additional claims based on the wrongful termination); *Muller* v. *Automobile Club of*

25  *So. California,* 61 Cal. App. 4th 431,450-51 (1998) (valid defenses to statutory claim

26  also defeat derivative public policy claim) (overruled on other grounds).

27  ///

28  ///

**C.**     **The Punitive Damages Claim Fails Because Plaintiff Cannot Show Clear And Convincing Evidence Of Malice, Oppression Or Fraud (Issues 6 and 7)**

11.     Punitive damages may be assessed only with *clear and convincing evidence* that a corporate officer, director, or managing agent engaged in liability-creating conduct that constituted oppression, fraud, or malice. Civ. Code §§ 3294(a), (b); *White* v. *Ultramar, Inc.,* 21 Cal. 4th 563,566 n.1 (1999). This requires a showing of "despicable" conduct. Cal. Civ. Code §§ 3294(b)-(c)(2). The conduct must be so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people. *Scott v. Phoenix Schools, Inc.,* 175 Cal. App.4th 22 702,715 (2009). Mere tortious conduct does not rise to the level of malice or oppression necessary to support an award of punitive damages. *Scott,* 175 Cal. App. 4th at 716 (citing *Taylor* v. *Sup. Ct.,* 24 Cal. 3d 890,894-95 (1979)). Even wrongful termination, without more, does not support punitive damages. *Id.* at 717; *see also, Ackerman* v. *Western Elec. Co.,* 643 F. Supp. 836, 857 (N.D. Cal. 1986) (discriminatory conduct that was "unfounded, misguided and extremely ill-advised" is insufficient for punitive damages).

12.     "[C]lear and convincing" evidence must "be so clear as to leave no substantial doubt; sufficiently strong to command the unhesitating assent of every reasonable mind." *Mathieu v. Norrell Corp.,* 115 Cal. App. 4th 1174, 1190 (2004) (citation omitted).

13.     Defendants are entitled to partial summary judgment on Plaintiff's punitive damages claim because he cannot show malice, oppression or fraud. Rather, the undisputed evidence is to the contrary. Carper was hired by KTLA to help him after an extended period of unemployment, he was given five months' notice that his position  would be eliminated, and he was given an offer to be an AE at KSWB, which had six  figure earnings potential. There are no facts that would warrant a punitive damages  award, and partial summary judgment is warranted on this claim.

**D.    The Claims Against Tribune Media Fail Because It Was Not Plaintiff's Employer (Issues 5 and 7)**

14.    Only an "employer" can be liable under the FEHA. Cal. Gov't Code § 12940(j)(1), (j)(4)(A). "[T]here is a strong presumption that a parent company is not the employer of its subsidiary's employees." *Laird v. Capital Cities,* 68 Cal. App. 4th 727, 737 (1998); *Us. v. Bestfoods,* 524 U.S. 51, 68 (1998). "A parent corporation is presumed not to be the employer of its subsidiary's employees unless the parent exercised control to a degree that exceeds the control normally exercised by a parent corporation." *Mayfield v. Sara Lee Corp.,* 2005 WL 88965, at *2-3 (N.D. Cal. Jan. 13, 2005).

15.    Under the integrated enterprise test, separate entities may be treated as a single employer only if they are an "integrated enterprise" when examined in connection with four factors: (1) the interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. Common ownership or control alone, however, is never enough to establish parent liability. "What the plaintiff must show, rather, is that the parent has exercised control 'to a degree that exceeds the control normally exercised by a parent corporation.'" *Laird, 68* Cal. App. 4th at 738.

16.    Courts deem "centralized control of labor relations" the most important factor of the integrated enterprise test. *Frank v. Us. West, Inc.,* 3 F.3d 1357,1363 (10th Cir. 1993). To satisfy this factor a plaintiff must prove that the business entity exercised day-to-day control of routine employment matters of another entity. *Laird,* 68 Cal. App. 4th at 732, 738-39 ("control" element not satisfied where supervisors who fired plaintiff were employed by subsidiary); *Maddock v. KB Homes,* 248 F.R.D. 229 (C.D. Cal. 2007) (parent not liable for subsidiary's wage violations because it did not hire or fire subsidiaries' employees, did not supervise or control employees' schedules and duties, and did not determine compensation rate for employees). Here, Plaintiff has no evidence that Tribune Media exercised more control than that which

a parent corporation would normally exercise over its subsidiary. *Laird,* 68 Cal. App. 4th at 739-40.

17.    In addition, Plaintiff may not hold Tribune Media liable on an agency theory because he cannot show that Tribune Media controlled the employment decisions of KTLA so as to cause it to become merely the instrumentality of Tribune Media. *Laird,* 68 Cal. App. 4th at 741; Cal. Civ. Code § 2295 ("agent" represents principal in dealings with third persons"). Rather, the evidence is to the contrary.

18.    Finally, Plaintiff cannot proceed against Tribune Media on an alter ego theory, which has an even higher threshold test than the "integrated enterprise" test. *Laird,* 68 Cal. App. 4th at 742. Before a separate entity will be deemed an "alter ego" of another company, and the separate corporate forms be disregarded, plaintiff must  establish (1) a unity of interest exists whereby one entity operates as the mere instrumentality of the other entity; and (2) an inequitable result will occur if the conduct is deemed the actions of only one of the companies. *Id.; Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal. App. 2d 825,837 (1962).

19.    Each of Plaintiff's causes of action against Defendant Tribune Media Company fail as a matter of law because Plaintiff cannot dispute that KTLA, LLC - not Tribune Media Company - was his employer because: (1) there is a presumption that a parent corporate entity does not employ the employees of a subsidiary, and Plaintiff has no evidence to rebut the presumption; (2) there is no evidence of an integrated employer relationship between Tribune Media and KTLA; (3) there is no evidence of an agency relationship between Tribune Media and KTLA; and (4) there is no evidence that Tribune Media is an alter ego of KTLA.

**E.    Partial Summary Judgment Should Be Granted Based On After-Acquired Evidence (Issue 8)**

20.    The after-acquired evidence doctrine applies when an employer learns that an employee, who is suing the employer, engaged in wrongdoing that would have resulted in the employee's termination had the employer mown about the wrongdoing

while it still employed the employee. *McKennon* v. *Nashville Banner Pub. Co.,* 513 U.S. 352,362 (1995); *Camp* v. *Jeffer, Mangels, Butler & Mamaro,* 35 Cal. App. 4th 620, 632 (1995). This defense may be summarily adjudicated if the employer proves by a preponderance of evidence that it would have fired the employee for the misconduct. *O'Day* v. *McDonnell Douglas Helicopter Co.,* 79 F.3d 756,761-64 (9th Cir. 1996) (plaintiff failed to rebut company representative's declaration that plaintiff would have been terminated for misconduct; summary judgment for employer on after-acquired evidence defense). If the employer meets its burden, the employee cannot recover certain damages. *McKennon,* 513 U.S. at 361-62 ("neither reinstatement nor front pay is an appropriate remedy" for wrongdoing plaintiff).

21.     Carper cannot dispute that the cancellation requested by the client was not processed, that he sent an email to the client that the General Manager of Sales found objectionable, that KTLA incurred a loss of over $10,000 because the order was not cancelled, and that he received commissions on the full amount of the order. Carper also cannot dispute that based on these circumstances, had he still been employed, his employment would have been terminated when this all came to light. Defendants are entitled to summary judgment on their affirmative defense of after-acquired evidence because they have shown as a matter of law that had Plaintiff remained employed, he would have been terminated on March 6, 2015 when evidence of his malfeasance was discovered.

## **PLAINTIFF'S CONCLUSIONS OF LAW**

1.     "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.  Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L.Ed. 2d 202 (1986).

Mr. Carper is only required to show "that sufficient evidence supporting the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S. Ct. 1575, 1592, 20 L.Ed. 2d 569 (1968).

"The court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonably jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F. 2d 626, 631 (9th Cir. 1987).

Mr. Carper "need only present evidence from which a jury *might return* a verdict in his favor." *Anderson*, 477 U.S. at 257 (emphasis added).

2.    As set forth by the Supreme Court, the *McDonnell Douglas* test places the initial burden on plaintiff to establish a *prima facie* case of discrimination. *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317. In order to establish a *prima facie* case, plaintiff must show that he was: 1) a protected member of the class; 2) qualified for the position he sought or was performing competently in position he held; 3) he suffered an adverse employment action, such as termination or demotion; and 4) some circumstance suggests discriminatory motive. *Id.* at 355.

California case law makes clear that "a plaintiff's *prima facie* burden is *minimal*. The amount of evidence that must be produced in order to create a *prima facie* case is very little." *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 197 (citations omitted) (emphasis added.) "A plaintiff must show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion. The *prima facie* burden is *light;* the evidence necessary to sustain the burden is *minimal.*" *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310 (internal citations omitted) (emphasis added.)

Once a plaintiff establishes a *prima facie* case, a presumption that the employer discriminated arises . . . The burden will then shift to the employer to rebut the

presumption by producing admissible evidence that its action was taken for a legitimate nondiscriminatory reason. *Guz*, 24 Cal.4th at 355-356. If the employer sustains this burden, the presumption of discrimination disappears. *Id.* at 356.

The plaintiff then has the opportunity to "attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." *Id.*

3.    *Berquist v. Washington Mut. Bank* (5th Cir. 2007) 500 F.3d 344, 350 ("[A] plaintiff challenging his termination or demotion ... can ordinarily establish a *prima facie* case of age discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action."); *Slattery v. Swiss Reinsurance America Corp.* (2d Cir. 2001) 248 F.3d 87, 92 ("The qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of [the] job."). Moreover, as the *Sandell* Court has explained:

> [W]e agree that a plaintiff must demonstrate some basic level of competence at his or her job in order to meet the requirements of a *prima facie* showing, the burden-shifting framework established in *McDonnell Douglas* compels the conclusion that any measurement of such competency should, to the extent possible, be based on objective, rather than subjective, criteria . . . . . (See *White v. Columbus Metro. Housing Authority* (2005) 429 F.3d 232, 243, fn. 6, citing, e.g., *Vessels v. Atlanta Independent School System* (11th Cir.2005) 408 F.3d 763, 769 [any consideration of the employer's subjective criteria is not relevant until the later stages of the *McDonnell Douglas* framework, because "[a] contrary rule, under which an employer's subjective evaluation could defeat the plaintiff's initial *prima facie* case, cannot be squared with the structure and purpose of the *McDonnell Douglas* framework."].) A plaintiff's burden in making a *prima facie* case of discrimination is not intended to be onerous.

*Sandell,* 188 Cal.App.4th 297, 322 (emphasis added.)

4.    In most disparate treatment employment discrimination cases, the plaintiff will lack direct evidence of the employer's discriminatory intent. *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138. However, in the instant case, there is certainly a substantial amount of circumstantial evidence in this case, all of which points directly to KTLA's pretext.

The particular value of circumstantial evidence was stated in *Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90, when the Court recognized that direct evidence was rare stating "We have often acknowledged the utility of circumstantial evidence in discrimination cases . . . . Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." In most disparate treatment discrimination cases, plaintiff will have to rely on circumstantial evidence and the inferences that may be drawn from such circumstantial evidence. *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189. In *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, the Court states:

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.

*See also Guz,* 24 Cal.4th at 356. As the Court will see below, Mr. Carper has an abundance of circumstantial evidence which creates triable issue of material fact at the current summary judgment stage. Mr. Carper will prove such circumstantial evidence and Mr. Carper's claims should be decided by a trier of fact.

5.  Evidence that an age-protected worker was replaced by a substantially younger person, or given more favorable treatment, may permit an inference of intentional age discrimination. *Guz*, 24 Cal.4th at 367. "Characteristics of the employee replacing a discharged or demoted employee are certainly relevant in evaluating an employer's motive for an employment decision." *Heard v. Lockheed Missiles & Space Co.*, 44 Cal.App.4th 1735, 1756 (1996); *see also Begnal v. Canfield & Associates, Inc.,* 78 Cal.App.4th 66, 76 (2000).

6.  Statements were made during the scope of employment by senior decision-makers regarding an employees employment "were certainly relevant and, along with other substantial evidence, created a strong inference of intentional discrimination." *Mangold v. California Pub. Utilities Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995). In *Turcotte v. ABM Janitorial Servs.*, 2011 WL 1154486, at *3

(W.D. Wash.), plaintiff testified at her termination meeting she was told "because of her age, she would be able to retire and collect her social security."  The court held "the comment suggests that Plaintiff's age was at least a motivating factor for the decision, and, as such, it would permit a jury to conclude that age was the 'but-for cause' of Plaintiff's termination." *Id.* Further*,* "although stray remarks may not have strong probative value when viewed in isolation, they may corroborate direct evidence of discrimination or gain significance in conjunction with other circumstantial evidence. Certainly, who made the comments, when they were made in relation to the adverse employment decision, and in what context they were made are all factors that should be considered." *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 541.  Although stray remarks may fall short of establishing a prima facie case it may still be relevant circumstantial evidence of discrimination. *Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398, 402.

      7.    Failure to produce documents may create a strong inference that the defendant's actions were not legitimate and pretextual. *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976 *overruled on other grounds by Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644.  In *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, the Court held that pretext was shown by the absence of *any* documentation confirming that a company hiring freeze was in place during the relevant time period.  The Ninth Circuit concluded that "the fact a large company did not have a single memorandum, meeting notes, or other evidence of the alleged hiring freeze or financial difficulties leading to the alleged hiring freeze provided adequate circumstantial evidence that the hiring freeze did not exist." *Id.* at 1123.

      In *Glenn-Davis v. City of Oakland* (9th Cir. 2005) 126 Fed.Appx. 375, plaintiff was a female lieutenant who qualified for a captain promotion and was placed on an eligibility list.  Upon plaintiff informing defendant that she was pregnant, defendant claimed that no candidates would be promoted and implemented a promotion freeze.

1    *Id.* In line with the reasoning of the cases cited above, the court held that the absence

2    of any evidence relating to this hiring freeze was pretext for racial discrimination.

3    *Id.*

4    8.    As explained in *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir.

5    2000): "We have held that the inference of discrimination arises in single-discharge

6    cases, sometimes called 'mini-RIFs,' where the terminated employee's duties are

7    absorbed by other employees not in the protected class.  The plaintiff in a single-

8    discharge case does not need to make a showing that "similarly situated" employees

9    were treated better because the inference of discrimination arises from the fact that

10   they were constructively "replaced" by workers outside of the protected class. The

11   point of the mini-RIF, unlike a true RIF, is that the job really was not eliminated at

12   all; because the fired employee's duties were absorbed by others, they were

13   effectively "replaced," not eliminated. (internal citation omitted.)    "When a

14   'reduction-in-force' includes only one employee—and the one employee is a member

15   of a protected class—this is some evidence of pretext.  *Aludo v. Denver Area

16   Council*, 2008 WL 3480079, at *5 (D. Colo.)

17   9.    Defendant's failure to follow its own express policies is evidence of

18   pretext.  *Stewart v. Rutgers*, *The State University* (3d Cir. 1997) 120 F.3d 426, 434

19   (arbitrary and capricious decision making, coupled with procedural errors, constitutes

20   evidence of pretext); see *Garrett v. Hewlett-Packard Co.* (10th Cir. 2002) 305 F.3d

21   1210, 1220 ("disturbing procedural irregularities can satisfy the requirements of a

22   pretext claim") (citing *Mohammed v. Callaway* (10th Cir. 1983) 698 F.2d 395, 400);

23   *see also Russell v. TG Missouri Corp.* (8th Cir. 2003) 340 F.3d 735, 746 ("We agree

24   . . . that an employer's deviation from its own policies can, in some instances, provide

25   evidence of pretext.").

26   It may be found that evidence of pretext exists when a defendant's actions are

27   inconsistent with its description of its own process.  *Hill v. Seaboard Coast Line R.*

28   *Co.* (11th Cir. 1989) 885 F.2d 804, 810 ("[Defendant's] explanation was inconsistent

with his description of the promotion process in general and with the specific circumstances of earlier promotion decisions."). A defendant who made an adverse employment decision not even aware of its own policy could be viewed as not making a legitimate disciplinary action. *Christie v. Foremost Ins. Co.* (7th Cir. 1986) 785 F.2d 584, 586.

10.    Defendants argue that Mr. Carper cannot demonstrate that Defendant subjected Mr. Carper to any fraudulent, malicious, or oppressive conduct.    In *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 220-21, the court stated:

> The policy that promotes the right to seek and hold employment free of prejudice is fundamental. Job discrimination "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general." (§ 12920.) The statute's aim is to provide effective remedies against the evil.
>
> . . . .
>
> Absent a convincing statement of contrary legislative intent, we rule that, in a civil action under the FEHA, all relief generally available in noncontractual actions, *including punitive damages*, may be obtained.

(emphasis added.)  Whether to award punitive damages is a question for the jury to determine. *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1658 ("Whether to award punitive damages and how much to award were issues for the jury.")

At the current stage of summary judgment, this Court, drawing all reasonable inferences in favor of Mr. Carper should not decide this issue as a matter of law. *Erdmann v. Tranquility Inc.* (N.D. Cal. 2001) 155 F.Supp.2d 1152, 1167 ("The Court cannot say at this stage of the proceeding, where it is required to draw all reasonable inferences in favor of the plaintiff, that no reasonable jury could conclude based upon

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED FACTS AND CONCLUSIONS OF LAW

the evidence presented by [plaintiff] that [defendant'] acts [in violation of FEHA] were despicable and taken in conscious disregard of Plaintiff's rights.")

11.    "The 'after-acquired evidence' doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later "discovers" evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct."  *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070 (9th Cir. 2004).  KTLA has the "burden of proof with respect to this issue on the employer, carefully articulating that the employer must establish not only that it *could* have fired an employee for the later-discovered misconduct, but that it *would* in fact have done so."  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996).

Dated: May 2, 2016              LAW OFFICES OF VICTOR L. GEORGE

                                By:  *\_\_\_/s/ Elvis Tran\_\_\_*
                                      VICTOR L. GEORGE
                                      WAYNE C. SMITH
                                      ELVIS TRAN
                                      Attorneys for Plaintiff
                                      DONN CARPER

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED FACTS AND CONCLUSIONS OF LAW