**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Donn Carper,<br><br>                          Plaintiff,<br><br>          v.<br><br>Tribune Media et al.,<br><br>                         Defendants. | CV 15-4259-VAP (SSx)<br><br>**ORDER GRANTING SUMMARY JUDGMENT** |

On April 25, 2016, Defendants Tribune Media and KTLA, LLC, filed their Motion for Summary Judgment. (Doc. No. 47.) On May 2, 2016, Plaintiff Donn Carper filed his Opposition (Doc. No. 48), and Defendants replied on May 24, 2016. (Doc. No. 54.) On July 11, 2016, Plaintiff filed a Sur-Reply. (Doc. No. 74.) After considering the papers filed in support of, and in opposition to, the Motion, the Court rules as follows.

## I.    BACKGROUND

On April 23, 2015, Plaintiff Donn Carper filed a complaint in Los Angeles Superior Court against Defendants Tribune Media and KTLA, LLC. (See Notice of Removal, Exh. B (Doc. No. 1).) The Complaint alleges that KTLA fired Plaintiff because of his age in violation of California's Fair Housing and Employment Act ("FEHA") and public policy. (Id.) On June 5, 2015, Defendants removed the case to the United States District Court for the Central District of California. (Notice of Removal.)

## II. LEGAL STANDARD

A court shall grant a motion for summary judgment or summary adjudication when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir. 1983). The moving party bears the initial burden of identifying the elements of the claim or defense as well as evidence that it believes demonstrates the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Celotex, 477 U.S. at 325. Instead, the moving party's burden is met by pointing out that there is an absence of evidence supporting the non-moving party's case. Id.

If the moving party carries its burden of production, however, the burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256; Nissan Fire v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). The non-moving party must make an affirmative showing on all

matters at issue for which it would have the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252; see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial, § 14:144. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Secs. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

### III. FACTS

To the extent certain facts or conclusions are not mentioned in this Order, the Court has not relied on them in reaching its decision. The Court has independently considered the admissibility of the evidence that both parties submitted and has not considered facts that are irrelevant or based on inadmissible evidence.

#### A. UNCONTROVERTED FACTS

The following material facts are supported adequately by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for the purposes of this Motion. See L.R. 56-3.

### 1. Carper's employment history and hiring at KTLA

In July 2009, Plaintiff Donn Carper had been unemployed for over nine months after his position at CBS was eliminated. (SUF No. 3.) Carper, throughout his career, was a sales executive selling advertisements for television stations. (SUF No. 1.) Carper met KTLA President Don Corsini and KTLA Vice President of Sales Mike Kinkaid while working with them at ABC Television in the 1970s and 1980s. (SUF. Nos. 2, 4.) After learning of Carper's unemployment, Kinkaid advocated for KTLA to hire him. (SUF No. 5.)

KTLA General Sales Manager Patti Tang worked with Carper at CBS. (SUF No. 7.) After learning of Kinkaid's desire to hire Carper, she voiced her concern that Carper "complicated situations and could not get business done." (Id.) Corsini had similar reservations about hiring Carper. He believed Carper had previous "work-related issues" and was "difficult to manage." (SUF No. 9.) Kinkaid reassured Corsini that he "would manage him [Carper] to the best of his abilities." (SUF No. 10.) Ultimately, Carper was hired as an account executive; he was 63 years old at the time. (SUF No. 11.)

As an account executive, Carper reported to the local sales managers who reported to the general sales manager who reported to Kinkaid as vice president of sales. (SUF No. 12.) The local sales managers at the time were Nancy Caldwell, Mary Pouliopoulos, Troy Arce Ganier, Patti Tang, and Jozef Duarte. (SUF No. 13.) Within nine months of Carper's hire, Pouliopoulos was promoted to general sales manager. (SUF No. 15.) Barbra Lopez-Nash was KTLA's human resources director. (SUF No. 18.)

### 2. Performance issues

Carper displayed performance issues early in his employment.[1] (SUF No. 19.)

#### a. Client complaints

Carper admits that he was taken off accounts at clients' requests (SUF No. 29) and that clients called Troy complaining about him.[2] (SUF No. 40.) Some of the complaints clients expressed included: "harassing phone calls" and "stalking," being "argumentative" and "difficult," and "that his emails were out of control." (SUF No. 41.)

One client said she could not get her work done and that when she asked for simple information, Carper replied with responses that were off topic. She told Ganier she did not want to continue working with him as her KTLA account

---

[1] Plaintiff disputes this fact. Plaintiff cites Kincaid's deposition testimony stating he had heard of one comment only regarding the length of Carper's emails. Evidence that Kincaid had heard of one comment only does not controvert Defendants' evidence that Carper displayed performance issues. First, Kincaid was not employed with KTLA during the entirety of Carper's tenure with the company. Second, Kincaid states that he had heard of one comment only, not that there was one comment only. Hence, the Court finds that Plaintiff has not put forth sufficient evidence to support his contentions. Accordingly, the Court finds this fact uncontroverted.

[2] Plaintiff disputes this fact. Plaintiff cites Kincaid's deposition testimony stating he had heard of one comment only regarding Carper's performance. Evidence that Kincaid had heard of one comment only does not controvert Defendants' evidence that clients called account supervisors complaining about Carper. First, Kincaid states that he had heard of one comment only, not that there was one comment only. Second, Plaintiff does not cite any evidence to support his contention that account supervisors did not believe Carper had these performance issues during his employment. Hence, the Court finds that Plaintiff has not put forth sufficient evidence to support his contentions. Accordingly, the Court finds this fact uncontroverted.

executive.[3] (SUF No. 41.) After Carper was removed from the account at the client's request, Carper called her, despite being told that he should not contact her again. (SUF No. 42.)

Another client complained that Carper would not follow instructions; rather than working with the person assigned, he would contact other people within the agency. According to this client, Carper did this on 15 different occasions. (SUF No. 43.) The client said she "pulled back" from dealing with the KTLA sales department because of Carper.[4] (SUF No. 44.)

The client representative at Living Spaces told a local sales manager that while he did not want to hurt Carper and could "tolerate" him, he would prefer to work with someone else and requested that KTLA assign a different account

---

[3] Plaintiff disputes this fact. Plaintiff cites Kincaid's deposition testimony stating he had heard of one comment only regarding Carper's performance. Evidence that Kincaid had heard of one comment only does not controvert Defendants' evidence that clients asked for Caper to be removed from their accounts. First, Kincaid states that he had heard of one comment only, not that there was one comment only. Second, Plaintiff does not cite any evidence to support his contention that account supervisors did not believe Carper had these performance issues during his employment. Hence, the Court finds that Plaintiff has not put forth sufficient evidence to support his contentions. Accordingly, the Court finds this fact uncontroverted.

[4] Plaintiff disputes this fact. Plaintiff cites Kincaid's deposition testimony stating he had heard of one comment only regarding Carper's performance. Evidence that Kincaid had heard of one comment only does not controvert Defendants' evidence that the client threatened to "pull back" its business from KTLA. First, Kincaid states that he had heard of one comment only, not that there was one comment only. Second, Plaintiff does not cite any evidence to support his contention that account supervisors did not believe Carper had these performance issues during his employment. Hence, the Court finds that Plaintiff has not put forth sufficient evidence to support his contentions. Accordingly, the Court finds this fact uncontroverted.

executive to the account. (SUF No. 47.) After the new account executive took over the Living Spaces account, the business more than doubled. (SUF No. 48.)

Local Sales Manager Ganier told General Sales Manager Pouliopoulos about the client complaints and also told Pouliopoulos that she felt that Carper withheld information about problems with clients until the client was upset, frustrated, and future business was affected. (SUF No. 46.)

### b.   Supervisor complaints

Patti Tang believed that Carper overcomplicated situations, sent very lengthy e-mails with superfluous information, and frustrated KTLA's clients. She believed he would enter negotiations unprepared, lacked knowledge of the station's systems and processes, and ignored directives to learn.[5] (SUF No. 30.)

Ganier found Carper to be "more challenging" to manage than the other account executives because he did not report on his sales progress, he did not follow procedure, and he was not prepared.  (SUF Nos. 31, 37.) Carper admits that Ganier was upset with him because she felt that he was "operating behind her back" by working with a high-level KTLA executive on a project and not keeping her

---

[5] Plaintiff disputes this fact. Plaintiff cites Kincaid's deposition testimony stating he had heard of one comment only regarding Carper's performance. Evidence that Kincaid had heard of one comment only does not controvert Defendants' evidence that Carper lacked knowledge of the station's systems and processes. First, Kincaid states that he had heard of one comment only, not that there was one comment only. Second, Plaintiff does cite any evidence to support his contention that account supervisors did not believe Carper had these performance issues during his employment. Hence, the Court finds that Plaintiff has not put forth sufficient evidence to support his contentions. Accordingly, the Court finds this fact uncontroverted.

informed. (SUF No. 34.) Ganier proposed sending a written reprimand to Carper; Pouliopoulos forwarded it to Corsini, who replied, "Here we go again with more issues from Donn." (SUF No. 36.)

Jozef Duarte was frustrated that Carper could not use basic word processing tools like Excel, which the company used to track revenue. (SUF No. 49.) He felt that Carper undermined him in a client meeting and did not take responsibility for being unprepared. (SUF. Nos. 50, 52.) A client complained to Duarte that Carper was a "rookie," that the client did not want a rookie to manage the account, and that the client would not be spending any more advertising dollars at KTLA unless management took Carper off the account. (SUF Nos. 51-52.)

These local sales managers complained about Carper to Human Resources Director Barbra Lopez-Nash at manager meetings and individual meetings. (SUF No. 55.) Pouliopoulos and Nash agreed that they would give Carper a written disciplinary notice because verbal counseling had not been effective. (SUF No. 54.)

After Kinkaid left KTLA in 2013, Pouliopoulos reported directly to Corsini. (SUF No. 57.) She kept him informed on Carper's performance issues. (SUF No. 59.)

  c. **Low performance evaluations**

Carper received a "Needs Improvement" score in his 2010 performance evaluation, which noted that he "needs to work on communication skills both internally and externally and limit surprises, over promising and managing expectations." The evaluation said he "vacillated between being an amazing role

model during good times and disrespectful during high-pressure situations." (SUF No. 20.) Carper does not believe KTLA gave him the low-performance evaluation because of his age. (SUF No. 21.)

In November 2012, Carper received a written warning for insubordination. (SUF No. 22.) The warning highlighted his unprofessional communication style, combative tone, and inability to follow instructions. (Id.) The warning noted also a client's request that KTLA take Carper off the account. (Id.) The written warning ended by stating, "This is a very long standing problem that needs immediate and sustained attention. Failure to adhere to the directives in this document will lead to further disciplinary action which could and probably will include termination." (Id.)

Carper's 2013 mid-year evaluation detailed a number of areas in which he needed to improve, such as generating more revenue, improving client relations, communicating professionally, and reducing combativeness. (SUF No. 24.) The year-end evaluation gave him a score of 1.5 out of 3.0, the lowest score of any account executive. (SUF Nos. 27-28.)

### d. Carper chosen for termination and offered position in San Diego

In 2014, KTLA's advertising revenue started to decline because of lower ratings. (SUF No. 60.) KTLA operates on a calendar fiscal year with business plans and budgets prepared in July and August of the prior year. (SUF Nos. 63-64.) While 2013 was a "good year," 2014 began "poorly." (SUF No. 64.) At the end of the first quarter of 2014, KTLA was $2.2 million under budget projections, and by August 2014, KTLA was more than $5 million behind its revenue goals. (SUF No. 65.) During the first half of 2014, department heads were told that the station was

struggling, that they needed to watch their expenses, and that there would be significant cost cuts for the 2015 budget. (SUF No. 66.)

During the 2015 budget-cutting discussions, Corsini and Pouliopoulos decided to eliminate one account executive position for 2015. They decided Carper's position would be the one eliminated, because of his ongoing performance issues, including failure to meet revenue goals for three consecutive quarters. (SUF Nos. 69-72.) Carper was the only account executive who missed revenue goals for three consecutive quarters. (SUF No. 73.) Moreover, in 2013, Carper had the lowest mid-year and year-end evaluations. (SUF No. 77.)

Human Resources Director Lopez-Nash did not make the decision to eliminate an account executive position, and she did not select Carper for discharge. (SUF No. 95.) After learning that Corsini and Pouliopoulos eliminated Carper's position, she said, "We thought you wanted to retire, and if you want to retire, Don Corsini wants to throw you a retirement party." (SUF No. 94.)

In August 2014, Corsini told Carper that his position would be eliminated in 2015. (SUF. No. 78.) Other layoffs took place in 2014, and open positions were not filled.[6] (SUF No. 79.) Counting terminations and decisions not to fill open positions, the 2015 budget called for a headcount reduction of ten full-time positions. (SUF

---

[6] Plaintiff disputes this fact. Plaintiff cites Corsini's deposition testimony stating that he had never discharged an account executive due to a reduction in force before Carper. This evidence does not controvert Defendants' evidence that layoffs took place in 2014, and open positions were not filled in 2015. Hence, the Court finds that Plaintiff has not put forth sufficient evidence to support his contentions. Accordingly, the Court finds this fact uncontroverted.

No. 80.) KTLA hired two account executives in 2013, but has not hired an account executive since Carper's discharge and did not replace another account executive who left in 2015. (SUF Nos. 81-82, 98.)

Before he was informed that his position was being eliminated, Carper told Corsini that he wanted to transfer to San Diego because his daughter and grandchildren lived there. (SUF No. 84.) After learning of his discharge, Carper reiterated his desire to be transferred to San Diego. (SUF. No. 85.) In November 2014, Corsini offered Carper an account executive position in San Diego, but Carper turned it down. (SUF Nos. 88, 93.)

After Carper left KTLA, the station's management learned that that Carper failed to cancel an order by the Kevin's Jewelers account, which the client had requested in a timely manner.[7] (SUF No. 113.) This resulted in a billing error of $22,000. (SUF No. 118.) KTLA had to issue the client an $11,900 credit. (SUF No. 119.)

### B. Disputed Facts

The parties dispute (1) whether KTLA management opposed hiring Carper; (2) whether there was more than one comment by KTLA management regarding Carper's poor performance; and (3) whether KTLA management believed Carper was performing poorly during his employment.

---

[7] Plaintiff disputes this fact. Plaintiff cites to his own deposition, which states that "he did not remember if he made [the] changes for [the] December 2014 advertisements run." This does not controvert Defendants' evidence. Hence, the Court finds Plaintiff has not put forth sufficient evidence to support his contentions. Accordingly, the Court finds this fact uncontroverted.

## IV. DISCUSSION

### A. DISABILITY DISCRIMINATION UNDER FEHA

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination." Guz v. Bechtel Nat. Inc., 24 Cal. 4th 317, 354 (2000).

Under the three-part McDonnell Douglas test, the plaintiff bears the initial burden of establishing a prima facie case of employment discrimination. Schechner v. KPIX-TV, 686 F.3d 1018, 1023 (9th Cir. 2012). "Once the plaintiff has [established a prima facie case], the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer articulates a legitimate reason, the plaintiff must raise a triable issue that the employer's proffered reason is pretext for unlawful discrimination." See Earl, 658 F.3d at 1112.

"Although [Plaintiff] bears the burden of proving [a prima facie case] at trial, in the summary judgment context, the moving party bears the burden of demonstrating there are no material triable issues of fact and that it is entitled to judgment as a matter of law." Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166 Cal. App. 4th 952, 962 (2008). In other words, "to prevail on summary judgment, the employer is required to show . . . that . . . plaintiff could not establish one of the elements of [the] FEHA claim." See Dep't of Fair Emp't and Hous. v. Lucent Techs, Inc., 642 F.3d 728, 745 (9th Cir. 2011).

#### 1. Plaintiff's Prima Facie Case

To establish a prima facie case, a plaintiff must show that (1) he suffers from a disability; (2) he was performing competently in his job; and (3) he was subjected to

an adverse employment action. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Faust v. Cal. Portland Cement Co., 150 Cal. App. 4th 864, 886 (2007) (citing Deschene v. Pinole Point Steel Co., 76 Cal. App. 4th 33, 44 (1999)); Cal. Gov't Code § 12940(a).

The parties do not dispute that Plaintiff satisfies the first and third element of the prima facie case; therefore, the Court turns to the second element. (Mot. at 15.)

KTLA contends that Carper was not performing competently in his job. (Mot. at 15.) The uncontroverted evidence shows that (1) clients complained about Carper, including asking for him to be removed from their accounts; (2) supervisors were frustrated by his lack of preparedness and unprofessional communication style; and (3) that he received the lowest mid-year and year-end performance evaluations amongst the account executives.

During his time at KTLA, Carper did not follow client instructions. For example, he failed to deal with the client contact assigned, and instead attempted to contact others working for the client. (SUF No. 43); he was removed from accounts at clients' requests (SUF Nos. 29, 40); and he contacted former clients despite being instructed not to do so. (SUF No. 42.) Clients "pulled back" from dealing with the KTLA sales department because of Carper. (SUF No. 44.) One client told a local sales manager that while he did not want to hurt Carper and could "tolerate" him, but he would prefer to work with someone else and requested that the company assign a different account executive to the account. (SUF No. 47.) After the new account executive took over the account, the business more than doubled. (SUF No. 48.)

13

Supervisors complained that Carper overcomplicated situations, sent very lengthy e-mails with superfluous information, and frustrated KTLA's clients by entering negotiations unprepared. (SUF No. 30.) One supervisor said Carper was "more challenging" to manage than the other account executives because he did not report on his sales progress, did not follow procedure, and was not prepared. (SUF Nos. 31, 37.) Carper frustrated other supervisors because he could not use basic information technology tools like Excel, which KTLA used to track revenue. (SUF No. 49.)

Carper received multiple written warnings for insubordination and poor performance. (SUF Nos. 22, 30.) These warnings highlighted his unprofessional communication style, combative tone, and inability to follow instructions. (Id.) The warnings noted clients' requests that Carper be taken off their accounts. (Id.) Moreover, Carper received the lowest performance evaluations in 2013 and was the only account executive to miss revenue goals for three consecutive quarters. (SUF Nos. 27-28, 69-72.)

"[A] plaintiff asserting… employment discrimination claim under the FEHA must show that he is a 'qualified individual,' meaning that he 'can perform the essential duties of the employment position with reasonable accommodation.'" Bates v. United Parcel Serv., Inc., 511 F.3d 974, 999 (9th Cir. 2007) (citing Green v. State, 42 Cal. 4th 254, 260 (2007)). Here, Carper's performance falls below that of a qualified individual. He could not perform the essential duties of his position, including ensuring client satisfaction and retention, and meeting revenue goals.

Carper contends that he performed his duties competently. He cites his years of experience in television advertising and general statements of praise by former KTLA VP of sales, Mike Kincaid. (Opp. at 15-16.) These statements of praise, however, do not controvert Defendant's evidence of Carper's incompetency. Moreover, Kincaid did not work for KTLA when the station decided to discharge Carper.

Hence, Carper has not produced a material triable issue of fact as to whether he was performing competently.

Accordingly, Carper fails to establish his prima facie case. Even if Carper were able to establish his prima facie case, KTLA can articulate legitimate non-discriminatory reasons for terminating him.

2.  **KTLA's Legitimate Non-discriminatory Reasons**

KTLA's legitimate non-discriminatory reasons for firing Carper are client dissatisfaction, budget cuts, and poor performance. (Mot. at 15.)

In sales, client dissatisfaction and poor performance are legitimate non-discriminatory reasons for termination as a matter of law. See Black v. Baxter Healthcare Corp., 129 F.3d 124, at *1-*3 (9th Cir. 1997) (summary judgment affirmed in discrimination case where plaintiff was terminated for poor performance, including customer requests that plaintiff be removed from their accounts); Drumm v. Morningstar, Inc., 2009 WL 2612311, at *3 (N.D. Cal., Aug. 24, 2009) (summary judgment affirmed in discrimination case where plaintiff was terminated from sales director position for legitimate business reason that two clients requested plaintiff's

removal from account). Here, it is uncontroverted that clients were dissatisfied with Carper's performance and asked that he be removed from their accounts.

California federal and state courts have held that budgetary cuts and workforce reductions constitute legitimate non-discriminatory reasons for termination decisions. See Schechner v. KPIX-TV, 686 F.3d 1018, 1025 (9th Cir. 2012) (holding that layoffs for cost reduction was a legitimate, non-discriminatory reason for discharge); Martin v. Lockheed Missiles, 29 Cal. App. 4th 1718, 1732 (1994) ("'[T]he depressed condition of [the employer's] . . . business and its business decision to reduce its staff with the result that [the employee's] services [are] no longer needed' can be good cause for discharging the employee [. . . ] and can also support an inference of good faith, and the absence of an improper motive, in the discharge decision.").

Here, it is uncontroverted that by August 2014, KTLA was behind its 2014 revenue projections and intended to reduce staff positions in the 2015 budget. (SUF Nos. 64-66.) During the 2015 budget-cutting discussions, Corsini and Pouliopoulos decided to eliminate one account executive position for 2015. (Id.) They decided that it would be Carper because of his ongoing performance issues, including missing revenue goals for three consecutive quarters. (SUF. Nos. 69-72.) Between layoffs and unfilled positions, KTLA reduced its staff by ten in 2015. (SUF No. 80.)

Accordingly, KTLA has articulated legitimate non-discriminatory reasons for firing Carper. The burden shifts to Carper to show that these reasons were pretext.

16

### 3. Pretext

To show pretext, Carper contends that substantially younger employees replaced him. (Opp. at 17-18.) A closer reading of the evidence paints a different picture. There were two account executive vacancies in early 2013. (SUF Nos. 81-82, 98.) KTLA interviewed for these positions throughout 2013 and hired Schell and Harper in late 2013, when KTLA was meeting its revenue goals. (Id.) KTLA did not consider a reduction in force until the 2015 budget meetings in mid-2014, when it was behind substantially in its 2014 revenue goals. (SUF Nos. 69-72.) Carper's position was eliminated in August 2014. (SUF. No. 78.) Hence, there is no evidence to support Carper's claim that KTLA's budget and staff reduction program was pretext for unlawful discrimination.

Carper cites Human Resources Director Lopez-Nash's comment: "We thought you wanted to retire, and if you want to retire, Don Corsini wants to throw you a retirement party" as evidence that KTLA's legitimate non-discriminatory reasons were pretext. (Opp. at 18.) This argument fails. First, there is no dispute that Lopez-Nash did not participate in the workforce reduction discussions, including the decision to eliminate Carper's position. (SUF No. 95.) She made these comments after she learned that Carper was being fired and did not talk to Corsini or Pouliopoulos about Carper retiring. (Id.)

Moreover, "isolated and 'stray' remarks are insufficient to establish discrimination without other indicia of discriminatory intent." Holtzclaw v. Certainteed Corp., 795 F. Supp. 2d 996, 1014 (E.D. Cal. 2011), quoting Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438 (9th Cir. 1990). "Indeed, 'remarks … when unrelated to the decisional process, are insufficient to demonstrate that the employer

relied on illegitimate criteria, even when such statements are made by the decision-maker in issue.'" Id. at 1014. (stray remarks about plaintiff's age did not establish pretext where they were unrelated to the decisional process; the human resources manager told plaintiff he should "think about retiring," that plaintiff "could [retire and] take his wife out," and "that [plaintiff] had turned fifty five (55) while on medical leave and that he was 'old enough to retire'").

Hence, there is no evidence to support Carper's claim that Lopez-Nash's stray comment unrelated to the decision-making process was pretext for unlawful discrimination.

Carper contends that the 2015 budget cuts and workforce reduction were pretext because KTLA did not produce any e-mails, memorandums, or meeting minutes regarding its cost-cutting efforts. (Opp. at 19.) KTLA did produce evidence, in the form of declarations, reflecting that 2013 was a "very good year;" that 2014 was an unexpectedly "bad year;" and that, as a result of the poor financial performance in 2014, the budget for 2015 would require cost-cutting, including reductions in positions. (SUF. Nos. 64-66.) Similarly, Corsini, Pouliopoulos, and other supervisors testified in their depositions that they discussed budget cuts during their monthly department head meetings. (SUF No. 66-67.) In all, ten positions were eliminated or left vacant in the 2015 budget. (SUF No. 80.)

Plaintiff cites McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1123 (9th Cir. 2004) for that proposition that the absence of documentation relating to a reduction in force creates a triable issue of material fact sufficient to deny summary judgment. McGinest's facts are distinguishable. In McGinest, the company did not have any

written documents to support its legitimate non-discriminatory reason that it did not hire the plaintiff because of a hiring freeze and because it was experiencing financial difficulties. Here, KTLA provided documents describing its financial difficulties, such as monthly revenue pacing reports and the 2015 Operational Plan. (O'Hara Decl. ¶ 15, Exhs. 3, 5.) These monthly reports show that KTLA was behind revenue projections by $2.2 million at the end of the first quarter and behind another $2.8 million at the end of the second quarter. (See Id.) The 2015 Operation Plan shows that by the end of 2014 there was a projected revenue deficit between $5 million and $6 million. (See Id.)

At the motion hearing, Plaintiff's counsel cited the "Highlights" section of the 2015 Operational Plan which stated that KTLA made a profit. He argued this raises a triable issue of material fact as to whether KTLA was experiencing financial difficulties. This argument is not persuasive because profit and revenue are two different calculations. For example, a company may fall below revenue goals and experience financial difficulty, but make a profit because it cut expenses during the year.

California state courts and federal courts have held that no inference of pretext can be drawn from the absence of documentation regarding an employee's termination or layoff. Merrick, 892 F.2d at 1438 (9th Cir. 1990) (refusing to draw inference that defendant's "reasons for not promoting [plaintiff] lack credibility, because these reasons were not documented until after the commencement of [plaintiff's] suit."); Callan v. Amdahl Corporation, 1995 WL 261420, at *2 (N.D. Cal., Apr. 24, 1995) ("[A]n employer's failure to document the reason for its employment decision does not constitute evidence of discrimination."); O'Neil v.

19

Dake, 169 Cal.App.3d 1038, 1044 (1985) ("[T]he lack of documentation cannot be considered affirmative evidence placing defendant's proffered fact in dispute.").

Hence, there is no evidence to support Carper's claim that the 2015 budget cuts and workforce reduction were pretexts for unlawful discrimination.

Accordingly, Carper has not provided any evidence that KTLA's legitimate non-discriminatory reasons were pretext for unlawful discrimination.

## V.   CONCLUSION

For the reasons stated above, the Court GRANTS Defendants Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated:   7/25/16

                                           Virginia A. Phillips
                                   Chief United States District Judge